CARLIN COMMUNICATIONS, INC. and Drake Publishers, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

No. 638, Docket 85–4158.

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1985.

Decided April 11, 1986.

Lawrence E. Abelman, Abelman Frayne Rezac & Schwab, New York City (Marianne F. Murray, of counsel), for petitioners.

Sue Ann Preskill, Washington, D.C. (Richard K. Willard, Hermes Fernandez, Jack D. Smith, Daniel Armstrong, of counsel), for respondents.

Before: OAKES, KEARSE, and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

We are not without empathy towards a federal agency torn between a congressional directive on the one hand and a court-imposed constitutional limitation on the other hand. Congress has directed the Federal Communications Commission ("Commission" or "FCC") to make regulations restricting access by minors to "dial-a-porn," the shorthand nomenclature of a telephone service that provides a caller with sexually explicit messages. 47 U.S.C. § 223(b)(2) (Supp. I 1983).

Under section 223(b)(2), compliance with these regulations establishes a defense to criminal prosecution for violating section 223(b)(1): making "any obscene or indecent communication for commercial purposes to any person under eighteen years of age...." This prohibition was enacted by a Congress well aware that not only were "very complex issues" relating to "technical feasibility" involved, 105 Cong.Rec. E5966–67 (daily ed. Dec. 14, 1983) (remarks of Rep. Kastenmeier), but that under the Constitution the adult population may not be reduced to "hearing only what is fit for a child." *Id.* at E5966 (citing *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957)). The regulations are to "permit adult access while limiting children's access," having in mind that "[i]f ... no such regulations are feasible, then less restrictive measures rather than broader restrictions will have to suffice to avoid any constitutional infirmity." 105 Cong. Rec. at E5966.

When the FCC's dial-a-porn regulations first came before us, we held that they were both overinclusive and underinclusive, *Carlin Communications, Inc. v. FCC*, 749 F.2d 113 (2d Cir.1984) (*"Carlin I"*). The Commission had sought to restrict the dial-a-porn operation of petitioner Carlin Communications, Inc. ("Carlin"), and its related corporations to the hours between 9 p.m. and 8 a.m. Eastern Time. 47 C.F.R. § 64.201 (1985). Without declaring that regulation impermissible, we held that the record was insufficiently developed to uphold it. Specifically, while holding that "[t]he interest in protecting minors from salacious matter is no doubt quite compelling," 749 F.2d at 121 (citing *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)), we nevertheless found that the Commission had "failed adequately to demonstrate that the regulatory scheme is well tailored to its ends or that those ends could not be met by less drastic means." 749 F.2d at 121. In fact, the time-channeling regulation denied adults access to dial-a-porn messages during daytime hours but did not prevent minors from calling the service during nighttime hours. Moreover, we expressed concern that the Commission had not adequately examined other alternatives that might better serve the competing interests at stake. We noted, for example, that it might be possible to "giv[e] subscribers the option of blocking access to certain telephone numbers from their premises," *id.* at 122 (footnote omitted), or to "requir[e] each caller to provide an access number for identification to an operator or computer before receiving the message." *Id.* After further development of the record, the Commission has approved a regulation that adopts this second suggestion. We are, however, on the record as developed before the Commission, not yet convinced that the regulation was chosen with the appropriate constitutional strictures in mind even though more "comprehensive investigation and analy-

848

sis," *id.* at 123, was given on this trip around.

We therefore grant the petition to review, continue the stay of the FCC order, which we granted pending appeal, and remand to the Commission. The stay, however, is granted only at the behest of the petitioners here, Carlin and Drake Publishers, Inc., and not on behalf of any of their affiliates or any other corporations located anywhere else in the United States and applies only to dial-a-porn service providers on the New York Telephone Company ("NYT") system. We are cognizant of the representation of petitioners' counsel at oral argument and otherwise that the petitioners do business only in the State of New York (even though long distance telephones may access their services). We also are aware of the very thorough and persuasive presentation before the Commission by the NYNEX telephone companies (NYT and New England Telephone and Telegraph Company) dated May 14, 1985, and incorporated in the record before us. Irrespective of whether the regulation may conceivably be valid as applied to the rest of the country, it is clearly arbitrary and capricious as to dial-a-porn providers on the NYT system.

The NYT Mass Announcement Service ("MAS") is a one-way distribution system in which it is technically infeasible to provide the two-way access (which apparently is available in most other parts of the country) between the caller and the information provider on which the so-called "access code" regulation now espoused by the Commission is based. In short, the FCC regulations would put Carlin out of business in New York. While this might be a consummation devoutly to be wished by some, it comports neither with this court's prior ruling, nor with overall constitutional or statutory considerations. So stating, we do not decide the constitutionality or feasibility of the Commission's access code regulation insofar as it applies to dial-a-porn providers

outside the NYT system. Nor do we express any opinion on the advisability or propriety of the Commission's imposing different requirements depending upon the telephone system involved.

FACTUAL BACKGROUND

We will assume a familiarity with our prior decision in *Carlin I.* To the extent necessary we will update the facts from the record before the Commission and this court.

We note that for the six months ending April, 1985, dial-a-porn calls appear to have leveled off at 6 to 7 million per month, approximating 15 to 18% of the total NYT MAS network calling volumes. Based on the NYT's MAS tariffs as of May 1985, which yield 2.0¢ per call to the "provider" of services, it is evident that the gross revenue of the dial-a-porn service providers [1] is in the vicinity of $130,000 per month. NYT receives 9.4¢ per call (the average revenue per message of 11.4¢ less 2.0¢) to compensate it for the services it renders to the information providers, including collecting revenues from customers. Thus, telephone company gross revenues from dial-a-porn exceed a half million dollars a month.

NYNEX normally does not keep data on usage of pay telephones by MAS callers in general or by dial-a-porn callers in particular. However, NYT did perform a study which found that out of 8,358 calls placed to the eight "adult entertainment" channels in the MAS network during the study period, only 144 or 1.72% were placed from coin lines. There was no indication what, if any, proportion of these 144 callers were minors. Telephone company data also point out that the incidence of interstate coin calling by minors to dial-a-porn is likely to be even less given the relatively high price—$2 or more—for the 57-second phone message, and the fact that any non-paid

1. Although the record indicates that there are eight dial-a-porn channels on NYT's MAS network, it does not indicate the identities of the service providers. Carlin was the only subscriber to submit comments to the FCC or to petition this court, and nothing in the record indicates that Carlin could not control several channels.

use of a pay phone, presumably charging the call to a home or credit card number, to call dial-a-porn interstate would show up on a bill. Thus, it is apparent that any solution to the dial-a-porn problem would not necessarily be rendered unacceptable merely because it did not cover coin calling.

### The Second Notice of Proposed Rulemaking

Following our decision of November 2, 1984, setting aside the time-channeling regulations, the FCC, in 50 Fed.Reg. 10510 (1985), issued a Second Notice of Proposed Rulemaking ("Second Notice") proposing "to amend its rules to provide a defense to enforcement of prohibitions against dial-a-porn services," *id.*, and soliciting additional comments on its regulations. The Second Notice invited comment on a new approach that "responds directly to the need of parents to police the use of their telephones." *Id.* at 10512. Under this approach telephone companies would be required to report on monthly bills to their customers any local or long distance calls made to 976-type numbers [2] and the dial-a-porn service providers would be required to reimburse the telephone companies for their administrative costs.

The Commission also called for comments on screening and blocking devices and services, *i.e.*, blocking access to one or more pre-selected telephone numbers either by installation of specialized equipment at the local telephone company's central office or by the use of call-blocking technology in the telephone customer's own terminal equipment. Previously the FCC had concluded that blocking or screening would require time to develop and could entail costs that would outweigh the benefits to be obtained. In the Second Notice, the Commission noted that since its original hearings, "there have been significant changes in the telephone industry," *id.*, and thus "[i]t is possible ... that screening at the originating central office is tenable."

*Id.* With reference to a blocking device installed at the calling customer's premises, the Commission had originally concluded that " 'no existing commercial device has a screening capability that could be deployed within the subscriber's terminal equipment.' " *Id.* at 10513 (quoting 49 Fed.Reg. 24996, 24999 (1984)). This court had noted, however, that certain federal buildings have installed equipment that blocks all outgoing 976 calls. *Carlin I,* 749 F.2d at 122 & n. 15. We also suggested that a regulation could be promulgated to provide the section 223(b) defense to a message provider who makes a blocking device available to telephone customers who request it. *Id.* at n. 16. The Second Notice stated that "there is considerable competition among terminal equipment suppliers, and it follows that there is an incentive among manufacturers, presumably eager for new opportunities, to develop a device that blocks outgoing calls from a subscriber's premises. We believe, therefore, that there exists a ready means of supplying such a device." 50 Fed.Reg. at 10513. The Commission added that

> there would appear to be no patently insurmountable obstacle to development of, for example, a simple electronic device with a locking cover that would allow a subscriber to block one of a series of telephone numbers—even an entire exchange—from being dialed from his or her premises.... Such a device would obviate the need for replacing or modifying any telephone within a home or office to prevent minors from dialing dial-a-porn numbers; and the "lock" would serve as a practical means of discouraging children from tampering with the programming.

*Id.* (footnote omitted). The FCC concluded that "the option of relying upon a blocking device at the subscriber's premises ... remains a practical option by wh[i]ch we may accomplish the mandate of Congress." *Id.*

**2.** "976" is the exchange used by NYT's MAS system, as well as other telephone companies' MAS systems, but there is no technical requirement that MAS channels be limited to the 976 exchange.

It also asked for comments upon access and identification codes, and suggested that an automatic coding scheme known as "scrambling," *i.e.*, mixing the content of a signal before transmission and reconstituting it on receipt, which the FCC had not previously considered, might be feasible and warranted public comment. Finally, since this court did not rule out the limitation of operational hours when carefully evaluated against all reasonable alternatives, *see* 749 F.2d at 123, the Commission invited comment on other time-channel approaches.

### Comments in Response to the Second Notice

In response to the Second Notice, the Commission received numerous comments, of which the following are included in our record: Carlin; NYNEX; the American Civil Liberties Union (ACLU); Ameritech Operating Companies; Telecommunications Technology Corp. (TTC); Cincinnati Bell Telephone Co.; Home Box Office and American Television & Communications Corp.; Pacific Bell and Nevada Bell; Pennsylvania Public Utilities Commission; American Telephone and Telegraph Co.; BellSouth Companies; Bell Atlantic Telephone Companies; and Mountain States Telephone and Telegraph Co., Northwestern Bell Telephone Co. and Pacific Northwest Bell Telephone Co. Reply comments followed from Carlin, NYNEX, the ACLU, and Carlin's counsel.[3]

NYNEX's May 14, 1985, comments to the Commission described its mass announcement service, which is offered to the public pursuant to state tariff. The provider makes recorded announcements available to large numbers of callers simultaneously without adversely affecting telephone service to others on the public

switched network. There are 44 channels on NYT's MAS network. Separate channels provide time and weather information, stock market reports, state lottery results, off-track betting information, and sexually explicit messages. According to NYNEX, the Bell operating companies, including NYNEX, may not provide recorded message services except for time and weather information, partly as an outgrowth of *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). As a result, NYNEX awarded the use of MAS channels to information providers through a random drawing procedure. Those awarded a channel provide the messages and, under the state tariff, are solely responsible for the contents of the recorded message. The 44-channel system handled over 470 million calls during 1984. Although the aggregate calling volume to the adult entertainment channels has diminished both in absolute numbers and as a proportion of all MAS calling, dial-a-porn remains one of the most popular programs.

NYT's MAS system is a one-way dedicated network. A subscriber calling a MAS number is not connected to the information provider or even to the master center, where the recorded messages are piped from the provider's premises. Rather, the call is connected to one of fifteen subcenters, where the caller is bridged onto the recording on a receive only basis. Theoretically, over 7,900 callers can be connected simultaneously to the same recorded message and the system as a whole can handle over 400,000 calls per hour.

The NYT MAS system features synchronous entry and automatic cut-off so that a caller is cut in at the beginning of a desired message and is disconnected after

---

**3.** Other parties submitting comments or replies in response to the Second Notice were Congressman Thomas Bliley; Continental Telecom, Inc.; Dial Info, Inc.; District of Columbia Public Service Commission; Minnesota Attorney General; Morality in Media; New York Department of Public Service; Phone Programs and Info Line, Inc. (joint comments); Productions-by-Phone;

Southwestern Bell; Tel Control; United States Catholic Conference; and United States Telephone Association (USTA). Late-filed reply comments submitted by Telecommunications Research and Action Center were accepted for filing as informal comments. 50 Fed.Reg. 42699, 42700 n. 3 (1985).

hearing the message once. The three phases operate so that no caller has to wait more than twenty seconds for the message to begin. While he is waiting a ring is heard, which presumably represents the connection through the public switched network to the designated subcenter. NYNEX carefully pointed out that "[m]ass announcement equipment used by other telephone companies around the country may include features (such as two-way communication between caller and information provider, or variable pricing arrangements) which the New York system, given its particular technology and call volume requirements, cannot provide." NYNEX comments took the position that an access code approach is not technically feasible in New York because the access code requires a two-way system and NYT's network is only one-way.

NYNEX also commented on its billing procedures, pointing out that it does not report local calls to its 976 numbers or for that matter to any other local numbers on customers' monthly bills. Indeed, to report the 976 local calls would cost almost $48 million per year plus a start-up cost of almost $7 million. On the other hand, interstate calls are reported separately on monthly bills by interexchange carriers. NYNEX's comments quoted Representative Kastenmeier to the effect that "parental responsibility must play a role here. If a family's telephone bill shows long distance calls—including any to a dial-a-porn number—it should be up to the parents, not the Congress or the FCC, to set rules which limit access by children to these messages." 105 Cong.Rec. at E5967.

Although NYNEX took the approach that blocking at the local telephone company offices is infeasible, it asserted that blocking at the caller's premises is an "[a]ttractive [o]ption," and is both "technically and economically feasible." NYT said it was currently developing a working model of a blocking circuit. Upon its installation where the access line enters the caller's premises (or on a single extension phone if the customer wishes), the circuit may be programmed to recognize up to 128 combinations of dialed digits and, upon such recognition, the circuit drops the connection to the central office. Consequently, the call is never connected through the switch and therefore is not billed. NYNEX "anticipated that the final design of the circuit will permit the individual subscriber to select the numbers to be blocked, and to modify the selection subsequently.... [T]he programmable blocking circuit will sell for less than $50 per circuit." The comments went on to say that such a blocking circuit "would be more effective at its intended purpose—restricting minors' access to dial-a-porn—than screening and blocking in the central office." It would work equally well regardless of the type of central office and would not depend upon the availability of code controls. It also would not be restrictive of the ability of adults and minors to make permissible calls because it can be programmed to block dial-a-porn numbers while permitting access to other MAS numbers. Moreover, it is not limited to blocking numbers on the 976 exchange. It would also save the telephone company administrative and installation costs as compared to central office blocking. As previously indicated, the telephone company also considered that dial-a-porn calling from pay telephones is minimal.

NYNEX then addressed the critical question who should bear the costs of blocking devices and whether telephone companies should be required to notify subscribers that blocking devices are available. NYNEX supported the Commission's suggestion in the Second Notice that the cost of obtaining and installing a blocking device be borne by the dial-a-porn operators. It did warn that implementation of such a cost-shifting measure raises three questions: (1) who decides who the dial-a-porn operators are; (2) how should costs be allocated among them; (3) what mechanism should be used for collection? NYNEX suggested that one solution would require all persons wishing to avail themselves of the section 223(b) defense to prosecution to identify themselves to some central author-

ity, either the Commission or an independent association. This authority would serve as a clearing-house, maintaining an up-to-date list of participants with appropriate identifying information, and administering a funding and allocation scheme, perhaps based on calling volumes or revenues. Parents or telephone companies desiring to be reimbursed for blocking devices would present their claims to the central authority for payment.

NYNEX, in its reply comments as of June 11, 1985, noted that one equipment vendor, TTC, is already marketing customer premises blocking equipment, but that by virtue of the divestiture decree NYNEX would not be able to market its own device. It suggested that the Commission may be able to fulfill its congressional mandate simply by finding that an appropriate blocking device is feasible and available in the marketplace and capable of assisting concerned parents. It agreed with several other telephone companies and the U.S. Telephone Association that "such a market-based approach—under which those customers desiring to block calls from their premises would obtain blocking devices in the competitive marketplace, at their own expense—may be the best solution." But NYNEX stated that if the cost of such a device is too great to be borne by concerned parents the Commission should not impose that burden on telephone common carriers or their ratepayers. Noting that cost-shifting presents special problems, the NYNEX reply comments indicate that the Commission may prefer to go instead to a scrambling, access code, or time-channeling approach, the cost of which would fall on the dial-a-porn operators and their patrons. The reply comments do not address themselves to the infeasibility of the access code approach.

By letter of counsel dated July 29, 1985, Carlin also maintained that "the only technical solution that is both feasible and likely to pass constitutional muster is the utilization of currently available customer premises equipment which allow [sic] telephone subscribers to block or limit outgoing calls," and that "[s]uch devices have been endorsed by various telephone operating companies." Carlin noted Pacific Bell's announcement on NBC's "Today Show" on July 2, 1985, that it will offer customer premises call control devices to all subscribers for a nominal one-time charge of no more than $5. Carlin's May 13, 1985, comments also stated that "[a]ny access and identification code procedure would be economically and administratively impracticable where the viability of the system relies on the ability to simultaneously service multiple callers."

### The Commission's Second Report

The Commission's Second Report and Order was adopted October 10, 1985, and published October 22, 1985, 50 Fed.Reg. 42699. The Commission rejected all network (exchange, line number, and equal access number forwarding) blocking, by which outgoing calls are impeded at telephone company central offices, because of economic and technical infeasibility. The Commission also found exchange (three- or four-digit) blocking constitutionally flawed because it would block all "dial-it" messages, see 749 F.2d at 122 n. 14; moreover, it would be ineffective since MAS numbers are not legally or technically required to be assigned to 976 exchanges.

The Commission rejected line number (seven-digit) blocking, even though there is "a recently innovated service commonly referred to as Customer Local Area Signalling Service (CLASS)," id. at 42703, which would permit such blocking from central offices. Telephone company comments indicated that although feasible, CLASS is currently experimental in nature and implementation of it entails an expensive process not expected to be generally available prior to 1987. Moreover, the CLASS blocking feature is not adequate to handle the large number of dial-a-porn systems currently in operation.

The Commission also rejected another blocking scheme, "equal access (ten digit) number forwarding," finding that number forwarding is not expected to become avail-

able on a nationwide basis for some fifteen years and even then would be of only limited use. The Commission indicated that it would continue to monitor the development of these blocking schemes and would be prepared to consider them as regulatory alternatives in the future. We commend the Commission for its careful consideration of these schemes and for its openminded flexibility toward dealing with them in the future. These findings relative to network blocking are fully supported by the evidence, are clearly not arbitrary and capricious, and do not merit further consideration in this opinion.

The Commission also considered the methods by which blocking may be implemented at the premises of dial-a-porn service providers, including time-channeling, message scrambling, and access and identification codes. Time-channeling was rejected along the lines of our previous opinion, on the basis that "it prevents adults from obtaining access to the messages during specified hours but does not provide reasonable assurance that minors will be restricted during the hours when general access is permitted." *Id.* at 42704. The FCC found message scrambling to be technologically feasible and not to require any network modification. The cost of scrambling equipment ranged from $150 to $1000 for each originating facility. NYNEX noted that implementation of this scheme is relatively simple as it is based on a one-way transmission system, which is the system employed by NYT. Message scrambling, however, requires that adults who desire to hear messages install decoding devices that cost $15 to $20 each. The Commission also pointed out that scrambling schemes impose a 24-hour per day restriction upon adults who wish to hear the messages but do not have the appropriate equipment. The Commission believed that a scheme that prevented minors' access to dial-a-porn by requiring all customers who wish to receive "adult" messages to be responsible for providing decoding equipment misallocated the burdens involved, and noted that

the burdens on customers arising from implementation of a scrambling regulation are greater than those presented by other access-limiting schemes.

The Commission concluded that the most effective means of restricting access by minors to dial-a-porn services while at the same time minimizing restrictions on the rights of adults was to require providers of such services either to send messages only to those adults who first obtain an access or identification code from the service provider or, alternatively, to require the caller to pay for the call by credit card before access is obtained. Under an access and identification code requirement, dial-a-porn providers would be required to issue personal identification numbers or authorization codes to requesting adult customers. Although the Commission concluded that live operator intervention for such calls would be economically impracticable, it felt that an automated code-verification system would be feasible. Under such a system, transmission of dial-a-porn messages would not occur until an authorized access code was communicated by the subscriber to the service provider. Each message provider would develop its own access code database and implementation scheme. Access or identification codes would be provided by mail to applicants "after 'dial-a-porn' providers reasonably ascertain that the applicant is at least eighteen years of age." *Id.* at 42705 (footnote omitted). The provider must use a written application procedure that seeks information such as the date of birth and credit card or driver's license number of the applicant. The provider would also have to implement a procedure to cancel codes that are reported lost, stolen, or misused. The Commission did point out that while use of the automated access code system would require that callers use dial-tone multifrequency telephones, rotary dialing equipment with ancillary tone equipment simulating tones made by multifrequency telephones could also be used. Thus, that part of the public that apparent-

ly still has rotary telephones [4] could nevertheless access dial-a-porn messages by purchasing and installing a relatively inexpensive device.

The Commission noted NYNEX's strenuous objection to the access code system based on the assertion that such a system requires two-way transmission and is therefore technically infeasible in NYT's one-way dedicated network. In the NYT system, as noted *supra*, message providers supply recorded messages to a master center, which distributes the calls to subcenters on a "receive only" basis. The subcenters then transmit calls to the calling party. Although there is no two-way connection between the caller and the service provider or between the caller and the master center, the Commission rejected NYNEX's contentions, stating that nothing in the record indicated that an access code system could not be implemented at the master center. The FCC also stated that a service provider could "choose not to utilize 976 'dial-it' services," but rather could use the normal two-way telephone lines, without mentioning that no revenues would be earned by this alternative. 50 Fed.Reg. at 42705. In any event, the Commission found that the costs of any such systems should be borne by the service providers, not by the telephone companies or customers.

The Commission noted Carlin's response that access and identification codes would be economically and administratively impracticable where the viability of the system relies on the ability simultaneously to service multiple callers, but rejected this assertion as "not constitut[ing] an adequate factual basis upon which we can conclude that [such a] scheme would be more costly than any other alternative." *Id.* It also found that "[u]nder the guidelines set forth in *Carlin* [I] and in view of the absence of data suggesting financial impracticability, we find that an access code requirement is generally less burden-some to 'dial-a-porn' purveyors and less restrictive of adult's access to the messages than network blocking alternatives, time channeling or scrambling." *Id.* at 42706. As to concerns that adults would be reluctant to release personal information to the message providers in order to obtain the access codes, the Commission simply said that "[t]hese comments suggest that 'dial-a-porn' providers devise methods to quickly process access code applications and use advertisements or other means to educate their customers of the requirement." *Id.* n. 52.

As to the alternative of blocking at customer premises, the Commission followed up on the Second Notice's expectation that entrepreneurs could produce such devices, and noted that commenting parties indicated that such devices "have been developed and are becoming available at moderate prices." *Id.* at 42705. The Commission took note of several specific devices. Implicitly recognizing their technical and economic feasibility, the Commission said that they "quite apart from our regulation will assist parents in effectively supervising their minor children and limiting access to 'dial-a-porn' or other message services...." *Id.* at 42706. Nevertheless, it found that they did not constitute the least restrictive means of accomplishing the intent of Congress since they did not restrict minors' access to dial-a-porn services from telephones not so equipped. Moreover, in response to comments that the cost for such devices should not be imposed upon parents, the Commission stated, "Requiring telephone subscribers to purchase these devices misallocates the burden of implementing a restriction on access to 'dial-a-porn' services by minors." *Id.* It considered the access code a "less restrictive means." *Id.*

The Commission's final conclusion and the one Carlin challenges is that its access code regulation "represents the most effective available means to limit minors' access

---

**4.** This record does not indicate the percentage of New York customers served by rotary phones.

to the messages but, at the same time, offers the least restriction on adults' access." *Id.* at 42707 (footnote omitted). The Commission said that "[w]hile [the access code regulation] may incidentally restrict adults' convenience in accessing 'dial-a-porn' messages, we believe our regulation reaches just far enough to achieve Congress' mandate and to meet the court's constitutionality guidelines." *Id.* Again, limiting our decision to the situation presented by the NYT one-way telephone network, we disagree.

## DISCUSSION

We reiterate the legal standard for analyzing the FCC's dial-a-porn regulations set forth in *Carlin I,* 749 F.2d at 121:

because the regulation is content based—it does not apply to all dial-it services, but only to those transmitting obscene or indecent messages—we scrutinize it more closely.

Under this more exacting scrutiny, we must determine whether the regulation precisely furthers a compelling governmental interest. The interest in protecting minors from salacious matter is no doubt quite compelling. Such an interest must be served, however, only by "narrowly drawn regulations," that is, by employing means "closely drawn to avoid unnecessary abridgment." The Government bears the heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression. And the State may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations.

(Footnote and citations omitted.) *See also City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, ——, 106 S.Ct. 925, 926, 89

L.Ed.2d 29 (1986) ("regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment"). As we also stated in *Carlin I,* we will not consider the question of the constitutionality of the underlying statute if the FCC regulation is invalid facially or as applied. *Id.* at 118. Because we find that the record does not support the FCC's conclusion that the access code requirement is the least restrictive means to regulate dial-a-porn, we again do not address the constitutionality of section 223(b).

We think the Commission has failed adequately to consider the feasibility of shifting the cost of customer premises blocking equipment to the providers of services and/or the telephone companies that gain income from the calls. On the record before us, it may well be that the least restrictive means for complying with the congressional mandate lies in this now plainly feasible device available from various manufacturers. The TTC device, for example, operates without the need for equipment modifications, either in telephone company facilities, information provider premises, or residences, according to the Commission itself. Yet the only possibility to which the Commission addressed itself was that the telephone customer be required to pay for these devices.

We cannot understand why the Commission did not address the matter of transferring the cost of customer blocking to the providers/telephone companies as a feasible system to comply with the congressional mandate, especially in view of the Commission's decision to impose the cost of access code identification procedures on the providers. The Commission's failure is especially troubling in light of the feasibility problems of an access code with respect to the NYT one-way MAS network, which apparently does not permit the caller to communicate the access code to the telephone company or service provider.[5] The FCC

---

**5.** The Commission stated that "nothing in the record suggests that implementation of a software supported access code recognition system at the master distribution center in a one-way

system such as NYNEX's would be infeasible." 50 Fed.Reg. 42699, 42705 (1985). Alternatively, the Commission suggests parties wishing or needing to assert the defense "might simply

stated that service providers "will have incentives to implement a code recognition system because it represents the most effective and least cumbersome means of satisfying the regulatory mandate." 50 Fed. Reg. at 42705. As the Commission did not consider the alternative of cost-shifting of customer blocking devices to the service providers, however, the record is barren as to why the service providers would not equally have incentives to implement a customer blocking system, which surely is less cumbersome since it does not involve the purchase of ancillary tone devices for rotary dialing equipment, mailings, or written age identification and cancellation procedures.

> choose not to utilize 976 'dial-it' facilities. Rather [they] may choose to implement access code recognition in two-way incoming trunks." *Id.*
>
> The Commission's second "alternative" is rather peculiar since a provider not on the 976 network (such as "Dial-a-Prayer" in New York) does not receive revenues on incoming calls; the provider must have eleemosynary motives. One also might ask how many lines such a provider would need to take the place of the MAS 976 number, and what the effect would be on the central system to which such a provider is connected.
>
> As to the first alternative, "implementation of a software supported access code recognition system at the master distribution center in a one-way system," we find no evidence in the record, and neither the Commission nor its brief point to any, that would support a finding of economic or technical feasibility. The only suggestion of technical feasibility is contained in the comments of Ameritech, which stated that in Illinois Bell's one-way system the caller connects to the central office and that the access code screening operations could be performed there. Ameritech noted that this procedure would involve the exchange carrier and would impose upon it prohibitive expense and administrative burdens. The FCC made no reference to Ameritech's statements concerning access codes. Moreover, in NYT's system, the caller connects to one of fifteen subcenters, not a central office. Even assuming the feasibility of locating the access codes at Illinois Bell's central office, as to which the FCC made no findings, there is nothing in the record to indicate feasibility in the NYT system. At the least, the Commission must show a "'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83

In short, on the record before us, we are unconvinced that, as to the NYT system, the access code requirement is the least restrictive means for complying with the congressional mandate. Accordingly, we remand to the Commission for exploration of the alternative of shifting the cost of customer premises blocking equipment to service providers and/or telephone companies.[6]

In so doing, we do not rule out altogether, nor do we pass on the constitutionality of, the use of access codes for, as we have stated, this decision relates only to Carlin and the NYT system.[7] Moreover, after the two schemes and cost-shifting devices pertaining to each of them have been more

> S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)); *see SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). On remand the Commission, if it is still seriously considering access code identification for the NYT MAS network, will no doubt wish to elaborate on the feasibility of such a system, especially on the availability of technology to permit its use on a one-way network in general and the NYT system in particular, as well as on the billing and cost problems referred to in the Comments of Pacific Bell and Nevada Bell, Ameritech, and USTA. We further note that the record is rather barren even as to the economic feasibility of access codes in two-way systems.

**6.** We do not at this point decide whether the FCC has the authority, under section 223 or otherwise, to require the telephone companies, which receive significant revenues from dial-a-porn, to help pay for customer premises blocking equipment. We note that shifting the total cost onto providers/telephone companies may result in a certain amount of "free ridership" among customers who are interested in the device for reasons unrelated to blocking access to dial-a-porn. We therefore recommend that the Commission consider the deterrent effect of imposing a percentage of the cost on customers.

**7.** The Commission's failure to consider shifting the cost of customer premises equipment makes it unnecessary for us to decide the constitutionality of the access code plan. That plan may very effectively prevent minors from accessing dial-a-porn, but we express our concern over the potential chilling effect of a written application and identification procedure. *See Talley v. California,* 362 U.S. 60, 64–65, 80 S.Ct. 536, 538–39, 4 L.Ed.2d 559 (1960); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 466, 78 S.Ct. 1163, 1174, 2 L.Ed.2d 1488 (1958).

thoroughly examined, it may be that the Commission will conclude that its order is after all the correct one for reasons that it may develop. We do not preclude it from such a conclusion, although we are not impressed by the fact that pay phones would not be covered by the customer blocking device system, at least in the absence of evidence contradicting the NYT study discussed *supra*. At the same time, the customer blocking device system does have the advantage of not hindering access by adults who wish to use these services or who would be deterred therefrom if required to place their name on someone's list.

Petition to review granted; regulation set aside as to the NYT MAS network.