[No. A041423. First Dist., Div. One. May 22, 1989.]

BRIAN T., a Minor, etc., et al., Plaintiffs and Appellants, v. PACIFIC BELL et al., Defendants and Respondents.

COUNSEL

Bernard David Walter, James R. Trembath, Michael J. Veiluva, Arlene Segal, Trembath, McCabe, Schwartz, Evans & Levy and Benjamin W. Bull for Plaintiffs and Appellants.

Margaret deB. Brown, Sarah J. Diehl, Steven B. Rathfon, Robert N. Harris, Gonzalez & Harris, John L. Williams, Manchester & Williams, Steven R. Friedman, G. Randall Garrou and Brown, Weston & Sarno for Defendants and Respondents.

## OPINION

**NEWSOM, J.**—This appeal concerns the dissemination of sexually explicit messages by telephone recordings available by dialing the number 976. The recordings are offered as part of an information access service which a defendant, Pacific Bell, initiated in August 1983. The service allows business subscribers to specify the price per call that the public is to be charged for messages on diverse subjects. Pacific Bell collects the charges as part of its regular billing process, deducts its own share, and remits the balance to the subscriber.

The action was brought by the parents of two minor children, Brian T. and Rebecca C., both as guardians ad litem and in their own individual capacities (hereafter individual plaintiffs or appellants). They were joined by an unincorporated association, Parents Opposing Pacific Bell's Exploitation of Children, and a nonprofit corporation, Advocates for Children's Health, Education and Welfare, Inc., which seek only injunctive relief (hereafter plaintiff organizations or appellants). The complaint names as defendants Pacific Bell, a corporation (hereafter Pacific Bell or respondent), and certain parties engaged in disseminating sexually explicit messages: Olmstead Communication, a business organization of unknown form, Tele-Promo, Inc., a corporation, and the officers of that corporation, Edward Tan and Wendy King (hereafter subscribing businesses or respondents).

The first amended complaint filed in the Superior Court of Alameda County alleged 13 causes of action. Relying on theories of nuisance and unlawful business practices, appellants moved for a preliminary injunction. The trial court denied the motion in an order filed December 18, 1987. Pacific Bell countered by filing a demurrer to each cause of action in the complaint on the ground of lack of subject matter jurisdiction and failure to state a cause of action. On January 29, 1988, the trial court sustained the demurrer without leave to amend "on each of the grounds stated in Pacific Bell's demurrer." On the same day, a judgment was entered dismissing the action "as to Pacific Bell only." Appellants filed a timely notice of appeal from the order denying their motion for preliminary injunction and from the judgment dismissing the action against Pacific Bell.

The complaint alleged that respondents have used 976 lines to carry "messages which are obscene and/or harmful to minors . . . with depictions of various sexual activities including but not limited to the following: 9.a. fathers seducing their minor daughters to engage in vaginal intercourse, oral copulation, and other sex acts; 9.b. children engaging in sexual intercourse with each other; 9.c. a female baby sucking on a bottle of her father's ejaculate; 9.d. school teachers seducing their students into engaging in sexual intercourse and oral copulation; 9.e. adult women seducing 12 and 13 year old girls to undress and engage in sexual fondling and oral copulation with them."

On June 7, 1987, Brian T., age 12, listened to approximately two and one-half hours of sexually explicit messages from a church telephone. About two weeks later, he engaged in unlawful sexual contact with Rebecca C., age 4, compelling her among other things to orally copulate him. As alleged, he "acted out of experimental curiosity [*sic*] and by urges incited by [respondent's] sex message products, and without any intention of hurting plaintiff Rebecca C." Shortly thereafter, Rebecca C. told her mother, plaintiff Paulette C., what happened. Paulette immediately told plaintiff Gary C., and the police. Brian T. was arrested and put in the custody of a juvenile detention facility. The two parents later joined to bring this action.

■ At the outset, we face the question of whether the superior court had jurisdiction over the action. The issue turns on the application of Public Utilities Code section 1759 which gives the Supreme Court original jurisdiction to review actions of the Public Utilities Commission: "No court of this State, except the Supreme Court to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, except that the writ of mandamus shall lie from the Supreme Court to the commission in all proper cases." Like most of appellants' other assignments of error, the question demands distinct analysis with respect to the suit for injunction and the claim of damages. We will consider first the court's jurisdiction to grant injunctive relief.

The general subject of the injunctive relief sought here—the use of information access services for sexually explicit messages—has been a matter of intensive legislative and regulatory controversy, at both federal and state levels, since the commencement of the service about six years ago. Early federal initiatives provide part of the context for later proceedings in California.

Public Law No. 98-214, enacted December 8, 1983, broadly prohibits the use of a recording device in interstate or foreign communication, or the

District of Columbia, to make "any obscene or indecent communication for commercial purposes to any person under eighteen years of age," but provided as a defense to prosecution "that the defendant restricted access to the prohibited communication to persons eighteen years of age or older in accordance with procedures which the [Federal Communications] Commission shall prescribe by regulation." (Codified in 47 U.S.C. § 223(b).) After initially proposing regulations that were set aside by the federal court (*Carlin Communications, Inc.* v. *F.C.C.* (2d Cir. 1984) 749 F.2d 113), the Federal Communications Commission (F.C.C.) undertook a second rulemaking proceeding that focused on three methods of restricting access of minors to 976 lines offering obscene messages: (1) blocking devices installed at the customer's premises, (2) blocking systems maintained at the utility's central station at the customer's request, and (3) customer access codes. Under this latter system, customers could listen to sexually explicit messages only by using a telephone credit card or an access code issued by the subscriber to persons providing evidence of being above age 18. The F.C.C. concluded that customer access codes provided the most effective means of restricting access by minors to the messages while minimizing restrictions on adults. (50 Fed.Reg. 42699 (Oct. 22, 1985).) Although the second circuit ordered a limited remand, the F.C.C. ultimately promulgated regulations establishing the use of such customer access code systems as a defense to federal prosecution. (*Carlin Communications* v. *F.C.C.* (2d Cir. 1986) 787 F.2d 846; 47 C.F.R. § 64.201.)

On April 17, 1985, the California Public Utilities Commission instituted an investigation into several aspects of information access service, including the use of the service to disseminate obscene messages to children. Later in the year, the Legislature enacted Assembly Bill No. 2250 that in effect mandated the investigation that was already under way. (Stats. 1985, ch. 1561.) Among other things, the statute enacted Public Utilities Code section 2884, subdivision (a), which provides: "The commission shall . . . establish procedures . . . to require every telephone corporation . . . to offer residential subscribers the option of deleting access to a class of information-access telephone service, commonly referred to as '976 service,' . . . [¶] The commission shall specify a method or methods for telephone corporations to institute this deletion of access option for residential subscribers, taking into consideration the operational requirements of the various types of telephone equipment in use throughout the state."

The Public Utilities Commission investigation culminated in an interim opinion, Decision No. 87-01-042, adopted January 14, 1987. With respect to the blocking alternatives, the Public Utilities Commission expressed general approval of the approach of central station blocking of sexually explicit messages but ordered a delay until January 1, 1988, in the implementation of

this system so that the alternatives of customer premises blocking and customer access codes could be further studied. Later in the year, the Public Utilities Commission conducted extensive hearings on these blocking alternatives and ultimately reaffirmed its initial decision in favor of central station blocking.[1]

In their notice of motion, appellants originally requested a preliminary injunction (1) to restrain respondents from operating their telecommunications businesses in such a manner as to permit minors access to recorded messages with sexually explicit content, (2) to command respondents to implement "screening or other devices" that would deny minors access to these messages, and (3) to require respondents to make available to subscribers "at a modest expense screening or other blocking devices such that recipients of telephone services can bar access to [these] messages." But in arguments on the motion, appellants appeared instead to request an injunction to restrain violations of Penal Code sections 313.1 and 311.2. We observe that this alternative form of injunction was not properly noticed. Nevertheless, we will consider it on its merits.

Although involving a claim of damages, *Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161], formulates a test that is applicable here. The jurisdiction of the superior court is "limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (See also *Pacific Bell* v. *Colich* (1988) 198 Cal.App.3d 1225 [244 Cal.Rptr. 714]; *Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 681 [187 Cal.Rptr. 219]; *Dollar-A-Day Rent-A-Car Systems, Inc.* v. *Pacific Tel. & Tel. Co.* (1972) 26 Cal.App.3d 454 [102 Cal.Rptr. 651].)

Applying this test, we find that the three forms of injunctive relief originally requested in the notice of motion for preliminary injunction would call for Public Utilities Commission action modifying previous decisions taken under the authority of Public Utilities Code section 2884. Such a challenge

---

[1] Meanwhile, the Public Utilities Commission came under new legislative directives. Assembly Bill No. 976, enacted September 25, 1987, established the use of customer access codes, not central station blocking, as a defense to prosecution under state law. The following year, Senate Bill No. 679, enacted June 21, 1988, required telephone utilities to provide separate prefixes for sexually explicit messages and prohibited them from charging customers for exercising the option to block sexually explicit messages. (Stats. 1987, ch. 1101; Stats. 1988, ch. 201; Pen. Code, § 311.8; Pub. Util. Code, § 2884, subds. (a) and (b).) Assembly Bill No. 3568, enacted September 27, 1988, explicitly included telephone messages in the definition of obscene matter and harmful matter in Penal Code sections 311 and 313 but exempted telephone corporations, as defined by the Public Utilities Code, from criminal liability under Penal Code sections 311.2 and 313.1 for carrying or transmitting proscribed messages. (Stats. 1988, ch. 1392; Pen. Code, §§ 311, 311.2, 313, 313.1.)

to the legality or adequacy of Public Utilities Commission orders lies only by writ of mandamus to the Supreme Court under Public Utilities Code section 1759.

 With respect to the request to restrain violations of Penal Code section 313.1, only subdivision (a) appears relevant to a preliminary injunction. At the time the preliminary injunction was sought, that provision punished "[e]very person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit any harmful matter to the minor . . . ." The statutory definition of "harmful matter" refers, inter alia, to material that "is patently offensive to the prevailing standards in the adult community as a whole with respect to what is suitable material for minors. . . ." In this statutory context, we construe the request to restrain violations of Penal Code section 313.1 as a disguised means of compelling respondents to adopt a customer access code system. The availability of blocking devices—whether at customer's premises or the central station of the utility—will not prevent the distribution of "harmful matter" to interested minors. As a practical matter, the respondents could assure that such "harmful matter" does not reach minors only by refusing to offer the messages to adults as well as minors or by establishing a customer access code system. ██ ██ We find nothing in appellant's arguments suggesting that, by this oblique means, they sought a complete suppression of "harmful matter;" and, in any event, such an objective would present obvious First Amendment problems.[2] Therefore, we can infer that the intended impact of the injunction was to pressure respondents to adopt and use a customer access code system. While a customer access code system would indeed eliminate the sort of grievance asserted in this action, the legal power to order such a system lay within the regulatory jurisdiction of the Public Utilities Commission.[3]

 The request to enjoin violations of Penal Code section 311.2, in contrast, avoided any conflict with the regulatory jurisdiction of the Public

---

[2] "[U]nder the Constitution the adult population may not be reduced to 'hearing only what is fit for a child.'" (*Carlin Communications* v. *F.C.C., supra,* 787 F.2d 846, 847; *Butler* v. *Michigan* (1957) 352 U.S. 380, 383 [1 L.Ed.2d 412, 414, 77 S.Ct. 524].)

[3] The statutory context was significantly changed by Assembly Bill No. 3568 which included telephone messages within Penal Code section 313.1 but exempted telephone corporations from its provisions. Appellants can now seek an injunction only against the subscribing businesses. We do not pass on the question whether an injunction restricted to these parties would invade the regulatory jurisdiction of the Public Utilities Commission. If such an injunction does avoid conflict with Public Utilities Commission jurisdiction, it will be subject to the considerations expressed in our analysis of appellants' request to enjoin violations of Penal Code section 311.2.

Utilities Commission but presented significant and unresolved questions regarding the availability of injunctive relief and First Amendment rights. In 1987, Penal Code section 311.2, subdivision (a), provided: "Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state possesses, prepares, publishes, or prints, with intent to distribute or to exhibit to others, or who offers to distribute, distributes, or exhibits to others, any obscene matter is for a first offense, guilty of a misdemeanor." Subdivisions (b), (c) and (d) deal with matter depicting minors engaging in sexual conduct. As defined by Penal Code section 311, the term "obscene matter" incorporated the standard of *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304] and *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607], and the term "matter" included "any recording."[4]

Since appellants appeal from the order denying their application for preliminary injunction, we do not decide the very difficult issues surrounding the use of injunctive relief to suppress materials that are presumptively protected by the First Amendment. The question before us is only whether the trial court abused its discretion in denying the preliminary injunction. ■ A principal factor in deciding whether to issue a preliminary injunction traditionally has been the "likelihood that the plaintiff will prevail on the merits at trial." (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) ■ We cannot analyze in depth the legal questions bearing on appellant's likelihood of success without prejudging a future adjudication in a more appropriate forum. ■ ■ ■ ■ ■ We observe, however, that appellants face threshold issues regarding the availability of injunctive relief.[5] Assuming they pass these

---

[4] Although Assembly Bill No. 3568 enacted in 1988 now exempts Pacific Bell from the provisions of Penal Code section 311.2, it will not otherwise affect our analysis. Section 311 now applies explicitly to telephone messages.

[5] They premise their application for an injunction on the right to enjoin unfair business practices under Business and Professions Code section 17200 and, alternatively, on the right to enjoin a public nuisance. While the California courts have interpreted section 17200 broadly (see *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 108 [101 Cal.Rptr. 745, 496 P.2d 817]; *People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660]; *People* v. *Toomey* (1985) 157 Cal.App.3d 1, 26 [203 Cal.Rptr. 642]; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65 [164 Cal.Rptr. 279]), it is possible to read the statute narrowly as applying to illegal methods of conducting a business but not to the business of selling illegal products, such as pornography. (*People* v. *E. W.A.P., Inc.* (1980) 106 Cal.App.3d 315, 324 [165 Cal.Rptr. 73] [dissenting opinion]; but see *People* v. *K. Sakai Co.* (1976) 56 Cal.App.3d 531 [128 Cal.Rptr. 536]; *People* v. *McKale, supra,* 25 Cal.3d 626, 633.) The traditional concept of a nuisance, moreover, entails the invasion of some protected interest. (7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, §§ 91-101, pp. 5314-5323.) Appellants have not articulated exactly how obscene messages offered on a 976 telephone line can be construed to come within this concept. Other problems are raised by the requirement of standing in Civil Code section 3495.

hurdles, their request for an injunction will place them in constitutionally untested waters.[6]

Furthermore, any provisional remedy issued before a final adjudication raises peculiar problems in this constitutionally sensitive area. The issues are closely analogous to those recently considered in *Fort Wayne Books, Inc.* v. *Indiana* (1989) 489 U.S. 46 [103 L.Ed.2d 34, 109 S.Ct. 916]. The Supreme Court there considered the constitutionality of a pretrial order seizing allegedly obscene materials. The order was based on an ex parte petition, including testimony and supporting affidavits and exhibits. On the basis of this showing, the court determined that probable cause existed to conclude that the defendant was in violation of state antiracketeering law and directed the immediate seizure of the real estate, publications and other personal property comprising three of the defendant's bookstores. Observing "that rigorous procedural safeguards must be employed before expressive materials can be seized as 'obscene,'" (*id.* at p. __ [103 L.Ed.2d at p. 51]), the Supreme Court held that "mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation." (*Id.* at p. __ [103 L.Ed.2d at p. 53].)

Federal cases involving administrative restrictions on the publication of expressive material have similarly held that "[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." (*Freedman* v. *Maryland* (1965) 380 U.S. 51, 59 [13 L.Ed.2d 649, 655, 85 S.Ct. 734]; *Blount* v. *Rizzi* (1971) 400 U.S. 410, 417 [27 L.Ed.2d 498, 503-504, 91 S.Ct. 423].) This standard leaves

---

[6] As we understand their legal theory, appellants wish to litigate questions left unanswered by the narrow terms of the Supreme Court's holding in *Vance* v. *Universal Amusement Co.* (1980) 445 U.S. 308 [63 L.Ed.2d 413, 100 S.Ct. 1156]. Ruling on a threatened injunction against future exhibition of obscene films, the Supreme Court held: "Accordingly, we agree with the Court of Appeals' conclusion that the absence of any special safeguards governing the entry and review of orders restraining the exhibition of named or unnamed motion pictures, without regard to the context in which they are displayed, precludes the enforcement of these nuisance statutes against motion picture exhibitors." (*Id.* at p. 317 [63 L.Ed.2d at p. 421].)

The cautiously worded holding of *Vance* leaves open the question whether an injunction against future exhibition of films violating an obscenity statute can be drafted in a manner that will withstand First Amendment challenge by incorporating "special safeguards governing the entry and review of orders" restraining the exhibition of the films and taking into account "the context in which they are displayed." The language of an earlier California decision, *People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42 [130 Cal.Rptr. 328, 550 P.2d 600], cert. denied sub nom. *Van de Kamp* v. *Projection Room Theatre* (1976) 429 U.S. 922 [50 L.Ed.2d 289, 97 S.Ct. 320] appears to call into question any injunction against future display of obscene materials that have not been "adjudged obscene following a fair and full adversary hearing." But other courts have split on the question. (See *Avenue Book Store* v. *City of Tallmadge, Ohio* (1982) 459 U.S. 997 [74 L.Ed.2d 393, 103 S.Ct. 356] [opn. of White, J., dis. from denial of cert.])

little scope for the issuance of a preliminary injunction. (Cf. *Heller* v. *New York* (1973) 413 U.S. 483, 492-493 [37 L.Ed.2d 745, 754, 93 S.Ct. 2789].)[7]

At the hearing on the preliminary injunction, appellants failed to submit an actual draft of a preliminary injunction that would pass this gamut of difficult issues. On appeal, they ask only that we give them an opportunity "to bring a new motion before the trial court." We decline to do so. The issues presented by their suit for injunctive relief, in our view, should not be resolved in a motion for preliminary injunction.

■ Appellants' claim of damages presents entirely different issues. The threshold question of jurisdiction involves ambiguous and shifting Public Utilities Commission decisions and revolves in part on the same disputed premise as a tort defense under *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265]. Before analyzing the question of jurisdiction, we may first consider the *Sokol* decision.

In that case, the San Francisco Chief of Police ordered Pacific Telephone and Telegraph Company to disconnect the plaintiff's telephone service pursuant to Public Utilities Commission Decision "number 41415" which required a telephone corporation to discontinue service to any customer upon receipt of a written notice from a law enforcement official that the service was being used unlawfully. The plaintiff sued Pacific Telephone and Telegraph Company for damages. After finding that Decision No. 41415 was unconstitutional, the Supreme Court addressed the question "whether a private entity may be held liable for complying with a mandatory order of the Public Utilities Commission valid upon its face, if that order is later found to be unconstitutional." (65 Cal.2d at p. 257.) It found guidance in earlier decisions holding "that no damage action lies against a private citizen who assists in making an arrest pursuant to the request of a police officer, even when the information upon which the arrest was made proves false." (*Ibid*.) Consistent with these precedents, the court held that the telephone company should not be held responsible for damages caused by its compliance with the unconstitutional Public Utilities Commission order.

*Sokol* thus absolves a telephone utility from liability in tort if it acted under compulsion of a Public Utilities Commission order. As a threshold question in analyzing superior court jurisdiction over a damage claim, we

---

[7]A California decision appears actually to rule out such a provisional remedy. *People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923 [171 Cal.Rptr. 85] holds that a suit to abate the exhibition of specific films as a public nuisance must prove the element of obscenity beyond a reasonable doubt. The standard of proof beyond a reasonable doubt appears incompatible with a mere showing by affidavit on which a preliminary injunction is based under the First Amendment.

must also inquire whether the utility acted pursuant to a Public Utilities Commission directive in the action resulting in injury. If it did act pursuant to a Public Utilities Commission directive, it will be necessary to inquire whether the damage claim may conflict with regulatory policies that generated the directive. On the other hand, if the utility acted, not under legal compulsion, but purely in the exercise of business discretion, no jurisdictional issue will arise.

Pacific Bell has offered information access service to the public—and modified the terms of this service—by filing advice letters with the Public Utilities Commission pursuant to the procedure of Public Utilities Commission General Order No. 96-A. Section C.1.B. of the initial tariff establishing information access service gave Pacific Bell a limited right to discontinue sexually explicit messages: "If any 976 IAS is being used to present any comment, request, suggestion or proposal which is lewd, lascivious, filthy, indecent or obscene the Utility upon receipt of an order of a court so directing shall terminate such service to the customer." In addition, Public Utilities Commission rule 31 required telephone utilities to "disconnect existing service to a customer upon receipt from any authorized official of a law enforcement agency of a writing, signed by a magistrate . . . finding that probable cause exists to believe that the use made or to be made of the service is prohibited by law. . . ."

Shortly after the initial tariffs were filed, two subscribers offering sexually explicit messages filed suit in the United States District Court for the Central District of California seeking a declaration that section C.1.B. and rule 31 were unconstitutional. Yielding to this challenge, the Public Utilities Commission ordered Pacific Bell to delete the disputed section of its tariff in Decision No. 87-01-042, effective January 14, 1987. The decision explains, "[w]e have taken pains to make it clear that our review of 976 services is neutral with respect to the content of 976 programs. A reading of Pacific's 976 tariff shows that there is a section which singles out any 976 IAS that '. . . is being used to present any comment, request, suggestion or proposal which is lewd, lascivious, filthy, indecent or obscene . . . .' It provides that '. . . the Utility upon receipt of an order of a court so directing shall terminate such service to the customer.' This provision runs counter to this Commission's policy of avoiding distinctions between 976 programs on the basis of content. There is no reason to maintain this tariff language especially when, in our opinion, the FCC has adopted a workable approach to implementing federal law which deals with obscenity. The current language at Pacific's 976 IAS Tariff, Section C.1.B. should be stricken. Instead, the tariff should state that the utility's transmission of 976 material alleged to be obscene shall be in accordance with federal law."

The Public Utilities Commission decision rendered moot the constitutional challenge to section C.1.B., but the U.S. District Court for the Central District of California proceeded to hold that rule 31 is "overbroad and violates the First Amendment when applied to 976 IAS communications on the basis of content."

Later in the year, the legal presuppositions of Decision No. 87-01-042 were questioned by a decision of the Federal Court of Appeals for the Ninth Circuit, *Carlin Communications* v. *Mountain St. Tel. & Tel.* (9th Cir. 1987) 827 F.2d 1291, cert. den. (1988) 485 U.S. 965 [99 L.Ed.2d 901, 108 S.Ct. 1586]. There, a plaintiff similarly offered sexually explicit messages on the defendant's (Mountain Bell) 976 line. Faced with public opposition, Mountain Bell announced a policy, not reflected in tariffs, of refusing service to any company offering sexual "adult entertainment" messages. (*Id.* at p. 1293.) Plaintiff brought suit asserting First Amendment rights and violation of Arizona public utility law. The District Court enjoined Mountain Bell from disconnecting plaintiff's 976 service on the basis of message content; the Court of Appeals reversed.

Adopting the analysis of *Dollar A Day Rent A Car Sys.* v. *Mountain States Tele.* (1974) 22 Ariz.App. 270, [526 P.2d 1068], the court held that the policy of refusing service for "adult entertainment" messages rested on a "reasonable business classification" under the principles of public utility law. Moreover, the court questioned whether state public utility law "made sense as applied to" information access service which does not provide a medium for private communication but rather serves as a kind of mass announcement service, most closely analogous to a small radio station. (*Carlin Communications* v. *Mountain St. Tel. & Tel., supra,* 827 F.2d at p. 1294.) Without actually holding state law inapplicable, the court reasoned, "Arizona may, of course, decide to make the phone company operate the 976 network as a content-neutral public forum open to any and all speakers. We are very reluctant, however, to *infer* such a principle from traditional public utility law." (*Id.* at p. 1295.) On these separate grounds, the court concluded, "[w]e therefore decline to hold that state public utility law compels Mountain Bell to carry salacious or pornographic messages, both lawful and unlawful, on its 976 network." (*Ibid.*) Since the termination of plaintiff's service was a matter of private business discretion, the court held that it did not entail state action that might violate the First Amendment.

Relying on the *Carlin* decision, Pacific Bell filed advice letter No. 15358, which would have given it discretion to disconnect any sexually explicit

messages. In response, the Public Utilities Commission adopted Resolution No. T-12077 on March 23, 1988. The resolution summarized the holding of *Carlin Conmunications* v. *Mountain St. Tel. & Tel., supra,* 827 F.2d 1291, in a manner that appeared to imply approval of the decision. Certain recitals affirmed that Pacific Bell was free to adopt a corporate policy, not reflected in tariffs, of refusing sexually explicit messages in its information access service: "WHEREAS: The Commission intends to clarify that D.87-10-042 never intended that its content neutral policy would extend beyond actions taken by the Commission and dictate whether or not a utility company could institute its own policies with regard to the content of 976 messages; and [¶] WHEREAS Private parties are free to develop their own policies in regard to content so long as they remain in compliance with state and federal law . . . ." The Public Utilities Commission nevertheless continued to adhere to its policy of requiring that tariffs be neutral with respect to the content of messages. Finding that advice letter No. 15358 would violate this policy, the commission rejected the advice letter, but indicated that Pacific Bell was still "free to set its own policy regarding the content of 976 programing as long as it is in compliance with state and federal law."

The policy enunciated in Resolution No. T-12077 lasted for less than four months. On July 8, 1988, the Public Utilities Commission issued Decision No. 88-07-040 which retracted its apparent endorsement of *Carlin Communications* v. *Mountain States Tel. & Tel., supra,* 827 F.2d 1291. The commission observed that a lawsuit filed in federal court earlier in the year, *Pacific Bell* v. *Epsilon Communications, Ltd., et al.* (N.D.Cal. Mar. 23, 1988) [Dock.No.Civ. C 88-101 EFL], raised the question of whether the analysis of the *Carlin* decision applied to Pacific Bell under California law. Not wishing to "prejudge important issues," the Public Utilities Commission deleted the portions of Resolution No. T-12077 that affirmed Pacific Bell's private right to withhold service to customers offering salacious messages. As revised, the resolution stood only for the proposition that advice letter No. 15358 violated the Public Utilities Commission's "current content neutral policy." The commission stated, however, that it "will be required to review its content neutral policy" in the light of Senate Bill No. 679 mandating separate prefixes for "sexually explicit messages."[8]

Whether or not the Public Utilities Commission indeed changes its content neutral policy, the agency's shifting interpretation of the policy and the decision in *Carlin Communications* v. *Mountain St. Tel. & Tel., supra,* 827 F.2d 1291, have generated substantial uncertainty as to the policy's effect.

---

[8] Another federal decision involving the same plaintiff, *Carlin Communication* v. *Southern Bell* (11th Cir. 1986) 802 F.2d 1352, holds that a tariff provision allowing Southern Bell to exclude messages with prurient content from 976 service did not entail state action.

The lawsuit noted in Public Utilities Commission Decision No. 88-07-040, *Pacific Bell* v. *Epsilon Communications, Ltd.,* may ultimately provide some clarifications. Pacific Bell there seeks a declaration of its right as a matter of private business policy to disconnect sexually explicit messages from 976 service. As we have noted earlier, if Pacific Bell possesses this right, it would be dispositive of the issue of jurisdiction we face here; a claim of damages would not interfere with the sphere of Public Utilities Commission regulation if it is predicated on an action that Pacific Bell took in the exercise of private business discretion and not under the compulsion of a Public Utilities Commission order. Appellants urge that we should adjudicate the question now. However, we conclude that, whatever may be the effect of the Public Utilities Commission's content neutral policy, the regulatory history affords Pacific Bell a defense to tort liability under the principle of *Sokol* v. *Public Utilities Commission, supra,* 65 Cal.2d 247. According, we do not need to resolve the question of jurisdiction.

At the time of the acts alleged in the complaint, Decision No. 87-01-042 barred Pacific Bell from filing a tariff authorizing it to disconnect subscribers offering salacious messages through a 976 line. The Public Utilities Commission had actually rejected a tariff provision allowing termination of service on court order; it would have been futile for Pacific Bell to seek broader authority to deny such service. With the benefit of hindsight, it may be argued that Pacific Bell might have made a public announcement, apart from tariffs filed with the Public Utilities Commission, establishing a policy of excluding salacious messages from 976 service. But "[r]ules and regulations [of a public utility] characteristically are required to be filed with the appropriate regulatory agency. . . ." (1 Priest, Principles of Public Utility Regulation (1969) p. 245.) If Pacific Bell had attempted to implement through a public announcement a policy that the Public Utilities Commission had rejected in a proposed tariff, it would unquestionably have exposed itself to disciplinary proceedings. (Pub. Util. Code, § 2107.)

The rationale of the *Sokol* decision should apply not only to unconstitutional Public Utilities Commission orders but to Public Utilities Commission decisions based on mistaken interpretations of the agency's duties and powers. As phrased in *Sokol,* the issue is "whether an action for damages should lie against the company, which could have refused to remove the telephones only by posturing defiance of an order of the commission, thus subjecting the regulated utility to discipline." Before the decision in *Carlin Communications* v. *Mountain St. Tel. & Tel., supra,* 827 F.2d 1291, and the reversals of Public Utilities Commission policy reflected in Resolution No. T-12077 and Decision No. 88-07-040, Pacific Bell could have declined to

carry the messages alleged here "only by posturing defiance" of Decision No. 87-01-042. Under the principle of *Sokol,* it cannot be held liable in tort.

The judgment is affirmed.

Racanelli, P. J., and Stein, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 17, 1989.