**FABULOUS ASSOCIATES, INC.**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, et al.**

**SAPPHIRE COMMUNICATIONS OF PENNSYLVANIA, INC.**

v.

**Robert P. CASEY, et al.**

**Civ. A. Nos. 88–4178, 88–4276.**

United States District Court,
E.D. Pennsylvania.

Aug. 23, 1988.

Helen H. Richardson, Phillips & Phelan, Philadelphia, Pa., Lawrence E. Abelman, Norman S. Beier, Abelman, Frayne, Rezac, New York City, for Sapphire Communications of Pennsylvania, Inc.

Scott Morgan, Rapp, White, Janssen & German, Ltd., Philadelphia, Pa., Anthony W. Parker (pro hac vice), for Fabulous Associates, Inc.

Maria Parisi Vickers, Chief Deputy Atty. Gen., Chief, Eastern Region, Office of Attorney General, Philadelphia, Pa., Barry Kramer, Deputy Atty. Gen., Pennsylvania Public Utilities Comm'n, Gov. Robert Casey and Attorney General Leroy Zimmerman.

James D. Crawford, Schnader Harrison Segal & Lewis, Philadelphia, Pa., for Bell Telephone Co. of Pennsylvania.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

The plaintiffs in the above captioned actions, Fabulous Associates, Inc. and Sapphire Communications of Pennsylvania, Inc., are providers of sexually explicit telephone message services colloquially referred to as "dial-a-porn". At the time of complaint and hearing, customers interested in accessing pre-recorded or live messages did so by dialing a number on the "976" telephone exchange. Plaintiffs commenced this action against state government officials [1] pursuant to the First, Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and the Pennsylvania Constitution to challenge the constitutional validity of a statute passed by the Pennsylvania legislature. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

On March 30, 1988, the Pennsylvania legislature enacted an amendment to the existing Public Utilities Code, 66 Pa.Cons.Stat. 101 *et seq.*, to add a section directed at telephone message services. The newly enacted § 2905 would require all telephone message services to: (a) include a preamble with their message informing listeners of the cost of the call, the itemization of said call on their telephone bill, and the sexual explicit nature, if any, of the forthcoming message, (b) implement a nine digit access code system which would deny access to explicit sexual materials absent the customer's entry of the code, and distribute access codes only upon written application, (c) institute reasonable procedures to ensure that access codes required for explicit sexual messages are not issued to minors, and (d) bear all costs associated with the new requirements. Section 2905 also imposes enforcement duties on the telephone company by requiring the company to condition continuation of line service on compliance with the section's provisions. Finally the act vests enforcement powers in the Public Utility Commission, and states that failure to comply with the section constitutes a violation of both a consumer protection and a theft statute.[2]

---

1. The complaint filed by plaintiff Fabulous also names Bell Telephone Company of Pennsylvania as a defendant.

2. The Telephone Message Services Act, Act No. 1988–37, 1988 Pa.Legis.Serv. 202 (Purdon), adds the following section to the Public Utilities Law:
    § 2905. Telephone message services
    (a) Notice.—Any telephone message service that provides a commercial, informational, public service or other message for a specific charge billed to the caller by a local phone company, prior to the presentation of the message, shall warn the caller that the cost of the call will be charged and that the charge will be itemized on the caller's telephone bill. In the event the message requested contains explicit sexual material, the warning preceding the message shall also inform the caller the message contains explicit sexual material.
    (b) Intrastate services.—Before any call can be completed to any telephone message service containing explicit sexual material, the caller shall have first obtained an access code number or other personal identification number consisting of not less than nine digits from the telephone message service through written application to the telephone message service. This access code number or personal identification number must be presented to the telephone message service after the warning message and in order to complete the call.
    (c) Dissemination to minors.—Access codes or personal identification numbers obtained

Codified at 66 Pa.Cons.Stat. § 2905, the amendment took effect on May 31, 1988. However, pursuant to this court's order of June 14, 1988 following a consolidated hearing, stipulated by the parties as the final hearing, subsections (d) and (g) of the amendment affecting the telephone company's enforcement role was stayed pending further briefing and the final disposition of the court.[3]

Plaintiffs challenge almost all sections of the Telephone Message Service Act, but their most vocal and strenuous objections concern the Act's access code requirement for telephone messages containing explicit sexual material. The Act would require providers of such services to implement a screening system precluding access by any caller to sexually explicit messages absent the entry of a nine digit code. Persons interested in receiving the messages would

to complete calls containing explicit sexual material as defined in 18 Pa.C.S. § 5903 (relating to obscene and other sexual materials) shall not be issued to a minor. Telephone message services shall exercise all reasonable methods to ascertain that the applicant is not a minor.

(d) Telephone company duties.—Every local telephone company and competitive interexchange telephone service shall list all telephone message service calls on the customer telephone bill and shall designate the type or title of message obtained. In addition, the telephone company shall provide, upon request, at no cost to the consumer, the name and address of any telephone service provider. All telephone companies shall include in their telephone message service tariffs, whether provided through the 976 exchange or otherwise, or in any contract with such telephone message service sponsor, a clause requiring compliance with this section as a condition for continuation of the service.

(e) Costs of service.—
(1) All costs relating to this section shall be borne solely by the telephone message service.
(2) All telephone message services shall provide, in writing, to all telephone companies and competitive interexchange telephone companies providing service in this Commonwealth, their complete telephone number or numbers, including area codes and type or title of service provided. This information shall be provided at the time of newly established servide, change in service and annually.
(f) Blocking access.—Every telephone company shall, except to the extent that written

first have to apply in writing to message providers to obtain access codes. Both plaintiffs presented evidence that they advertise their message service solely in adult magazines and that their messages already carry a preamble advising the listeners of the adult nature of the forthcoming message. Sapphire asserts that

[t]he imposition of any access code, and especially a nine-digit access code, as a condition of gaining access to Sapphire's customers, imposes a major financial and administrative burden upon Sapphire to implement its access codes, and will cause Sapphire to lose many of its customers, all on the basis of requirements imposed due solely to the content of Sapphire's programming.... Furthermore, adults will have free access only to audiotex materials fit for children and will be deterred from calling Sapphire's audiotex services, all by virtue of the requirement

authorization is required by a customer for availability of access to all or certain types of telephone message services, provide to customers the option of having access to such telephone message services blocked. The telephone company may not charge the customer any fee or other cost for blocking access to availability of telephone message services unless such telephone company has already provided such blocking to the customer without fee.

(g) Enforcement.—
(1) The Commission shall promulgate rules or regulations to ensure the compliance of telephone companies providing messages covered by this section.
(2) The failure of a telephone company to comply with this section shall be a violation of this section and the telephone company shall be subject to enforcement proceedings pursuant to section 502 (relating to enforcement proceedings by commission).
(3) Failure of a telephone message service to comply with this section shall be a violation of the act of December 17, 1968 (P.L. 1224, No. 387), known as the Unfair Trade Practices and Consumer Protection Law, and 18 Pa.C.S. Ch. 39 (relating to theft and related offenses).

§ 1, Telephone Message Services Act (footnotes omitted).

3. The stay imposed by the court eliminated the legal quandary faced by Bell of Pennsylvania in being statutorily obligated to take actions which might violate a subscriber's constitutional rights.

of having to obtain an access code.[4]

Plaintiffs also complain about the Act's proscription against the issuance of access codes to minors and its directive that "[t]elephone message services shall exercise all reasonable methods to ascertain that the applicant is not a minor", 66 Pa. Cons.Stat. § 2905(c). Plaintiffs argue that the language of subsection (c) unreasonably subjects message providers to criminal prosecution without adequate notice as to how compliance can be met.

The amendment incorporates by reference the definition of explicit sexual material utilized in Pennsylvania's obscenity statute, 18 Pa.Cons.Stat. § 5903 which states in pertinent part:

(c) Dissemination to minors.—No person shall knowingly disseminate by sale, loan or otherwise explicit sexual materials to a minor. "Explicit sexual materials," as used in this subsection, means materials which are obscene or:

(1) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

(2) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1), or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

The definition of "explicit sexual materials" utilized in the statute embodies two categories of messages, obscenity and obscenity as to minors. The Supreme Court has approved of a variable obscenity standard which entails consideration of the harm to children caused by certain types of sexually oriented matter. *See Ginsberg v. New York,* 390 U.S. 629, 643, 88 S.Ct. 1274, 1282, 20 L.Ed.2d 195 (1968). However, while matter that is obscene as to adults is necessarily so as to children, the reverse is not true. The sweep of the definition is broad enough to encompass both obscenity as to children and matter which, though sexually explicit, is not obscene as to adults. Hence it is not enough that the variable standard may be consitutional as applied to minors, since it is being applied as a restriction on adults' access to protected speech. *See American Booksellers Ass'n, Inc. v. Strobel,* 617 F.Supp. 699, 705 (E.D.Va.1985) ("In promoting the morals of its youth by restricting their access to certain communications, the state may not create barriers which simultaneously place substantial restrictions upon an adult's access to those same protected materials."), *aff'd, American Booksellers Ass'n, Inc. v. Commonwealth of Virginia,* 802 F.2d 691 (4th Cir.1986), questions certified to Virginia Supreme Court on other grounds, —— U.S. ——, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The court notes, moreover, that the statutory provisions regarding the telephone company's role transforms the section into a prior restraint on free speech, since it results in the automatic disconnection of the message where a provider of the message fails to implement a nine-digit access code system for explicit sexual materials or fails to otherwise comply with the section. The issue before the court, thus, is whether the requirements of the statute imposes an unconstitutional burden on adults' exercise of their first amendment rights with respect to sexually explicit telephone messages.

Both Sapphire and Fabulous contend that the appropriate legal standard for analyzing the constitutional validity of the statute is the standard enunciated by the Second Circuit in *Carlin Communications, Inc. v. FCC,* 749 F.2d 113 (2d Cir.1984) ("*Carlin I*"), *Carlin Communications v. FCC,* 787 F.2d 846 (2d Cir.1986) ("*Carlin II*") and *Carlin Communications, Inc. v. FCC,* 837 F.2d 546 (2d Cir.1988) ("*Carlin III*"). The Carlin decisions involved a challenge to regulations promulgated by the Federal Communications Commission pursuant to a statute creating an affirmative defense against prosecution for providers of sexual-

---

**4.** Sapphire's Memorandum of Law in Support of its Motion for a Preliminary Injunction, p. 5.

ly explicit telephone messages. This standard, initially articulated by Judge Oaks in *Carlin I*, 749 F.2d at 121, and reaffirmed in the later cases is one of exacting or close scrutiny:

> We take it as a given that the state cannot stifle speech because it disagrees with the speaker's view. Every content-based regulation thus should be reviewed under a stricter scrutiny than that of reasonableness because of the difficulty under *[Young v.] American Mini Theatres*, 427 U.S. at [50] 67, 96 S.Ct. at [2440] 2451 [49 L.Ed.2d 310], of determining whether the state is simply "hostile" to the speaker's point of view. Thus, because the regulation is content based—it does not apply to all dial-it services, but only to those transmitting obscene or indecent messages—we scrutinize it more closely.

Under this more exacting scrutiny, we must determine whether the regulation precisely furthers a compelling government interest. The interest in protecting minors from salacious matter is no doubt quite compelling. *See, Ginsberg, supra.* Such an interest must be served, however, only by "narrowly drawn regulations," *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 62 L.Ed.2d 73 (1980), that is, by employing means "closely drawn to avoid unnecessary abridgment," *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976). The Government bears the heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 74, 101 S.Ct. 2176, 2185, 68 L.Ed.2d 671 (1981). And the State may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations.

Defendants on the other hand urges the court to adopt the reasoning utilized by the Supreme Court in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In *Pacifica*, the Court refused to invalidate on first amendment grounds an adjudicatory action taken by the Federal Communications Commission against a radio station following its airing of a prerecorded monologue entitled "Filthy Words."[5] The monologue, originally delivered to a live audience by satirist George Carlin, focused on the societal taboo associated with the usage of several "filthy" words. Although the Commission recognized that the monologue though patently offensive to some was not necessarily obscene, it nevertheless justified the regulation of such "indecent" speech on the unique character of broadcast speech. According to the Commission,

> the concept of "indecent" is intimately connected with the exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs at times of the day when there is a reasonable risk that children may be in the audience.

56 F.C.C.2d at 98. Articulating a nuisance type rationale, the *Pacifica* majority determined that though protected by the First Amendment, patently offensive broadcast speech could still be regulated based on the context of the speech and the state's compelling interest in protecting children from such language.

Despite the similarity between Pennsylvania's interest in precluding minors from accessing dial-a-porn and the FCC's interest in "channelling" nonobscene but patently offensive speech away from a time slot during which children are most likely to tune in, I agree with the Second Circuit's conclusion in *Carlin III* "that the *Pacifica*

**5.** Although the FCC did not impose any sanctions on the radio station, it did note in its decision that its ruling would be "associated with the stations license file, and in the event that subsequent complaints are received, the Commission will then decide whether it should utilize any of the available sanctions it has been granted by Congress." 56 F.C.C.2d 94, 99; *Pacifica*, 438 U.S. at 730, 98 S.Ct. at 3030.

decision does not justify the regulation of indecent telephone messages." 837 F.2d at 560.[6]

First, the *Pacifica* decision is much narrower in scope than defendants suggest. The time of day the monologue aired was clearly the critical factor in the Court's determination of the appropriateness of the FCC's action. Indeed, in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) the Supreme Court rejected a more expansive interpretation of its *Pacifica* decision. Striking down a federal prohibition on the mailing of unsolicited advertisements for contraceptives, the Court stated:

> The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox. In *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), this Court did recognize that the Government's interest in protecting the young justified special treatment of an afternoon broadcast heard by adults as well as children. At the same time, the majority "emphasize[d] the narrowness of our holding," *id.*, at 750, 98 S.Ct., at 3041, explaining that broadcasting is *"uniquely* pervasive" and that it is *"uniquely* accessible to children, even those too young to read." *Id.*, at 748–749, 98 S.Ct., at 3040 (emphasis added). The receipt of mail is far less intrusive and uncontrollable. *Our decisions have recognized that the special interest of the Federal Government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication.*

463 U.S. at 74, 103 S.Ct. at 2884 (Emphasis added).

Second, unlike broadcast speech, telephone communication requires the active choice of the listener in selecting the desired message. On the other hand, one has little choice of what a particular broadcast message will be prior to its airing.

Under a *Carlin III* analysis, the question before the court is whether the challenged regulation unreasonably burdens the first amendment rights of plaintiffs and their customers.[7] Considerations pertinent to this inquiry includes the chilling effect of the statute on adults' access to nonobscene sexually explicit messages, the governmental interest furthered by the statute, and the existence of a less restrictive alternative.

The court recognizes the state's concern that unsupervised children will have access to sexually explicit messages. Indeed, the passage of the challenged amendment was undoubtedly fueled by a flood of complaints from parents billed for the calls made by their children on the 976 exchange.[8] However, in regulating such messages, the state must be wary of restricting the entertainment available to adults to only what is "fit for children." *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957). If the First Amendment "means that a state has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch", *Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969), then it certainly means that the state cannot censor or unreasonably burden the protected speech accessed or engaged in by adults vis-a-vis the telephone.

The Supreme Court "has long held that regulations enacted for the purpose of restraining speech on the basis of its content

---

**6.** While I conclude that *Carlin III* rather than *Pacifica* provides the appropriate standard of review, I nevertheless believe that the outcome reached by this court would remain the same even under the lesser standard of scrutiny which the Court in *Pacifica* appears to approve.

**7.** The standing conferred on plaintiffs is twofold. Plaintiffs not only have standing in their own right to challenge the threatened abridgment of their free speech rights, they may also

do so on behalf of willing adult recipients of their messages. *See Virginia v. American Booksellers Ass'n, Inc.*, — U.S. —, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988).

**8.** *See* Commonwealth Defendants' Supplemental Memorandum, at 18–19: "By enacting such a provision, the legislature has responded to consumer complaints of exorbitant telephone charges, often unknowingly accumulated by minors."

presumptively violate the First Amendment." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986). Consequently, the Commonwealth of Pennsylvania has burden of establishing that its chosen manner of regulating providers of explicit sexual telephone messages furthers a compelling state interest and places only reasonable restrictions on free speech.

Following consideration of all evidence produced, the briefs and oral argument, I am convinced that the new act is not the least restrictive means of furthering Pennsylvania's interest in the well-being of minors, and would unreasonably burden the communication of dial-a-porn messages to consenting adults. First the statute conditions an adult's access to such messages on his or her loss of anonymity as far as message providers are concerned. The state has argued that the application procedure required by the statute entails no greater loss of anonymity than from that required to obtain other services and imposes minimal inconvenience in light of the contemporary proliferation of credit cards and computer identification cards. This response, however, ignores the societal opprobrium associated with dial-a-porn messages and the probable undesirability of having one's name and address at the disposal of message providers and other third parties.[9] This self-identification process would clearly tend to chill the exercise by some adults of their first amendment rights.[10] Second, the implementation of the statute imposes substantial cost on providers of explicit sexual messages in altering their operations to accomodate access codes.[11] Third, all parties agree that consenting adults with rotary dial telephones would not be able to access the messages targeted by the statute absent their purchase of additional equipment.[12]

The aforesaid factors, standing alone, might not be sufficient to invalidate the

**9.** Plaintiff Saphire presented evidence of the unsuccessful attempt of one of the message service operations in the Washington, D.C. area to persuade its users to obtain an access code. Plaintiff alleges that the operation ran a recorded message directing all customers that access codes were being made available to all users and to apply in writing to the company to obtain one. According to plaintiff only two applications were received. Plaintiffs would have us conclude that customers of telephone message services would simply not apply either because of their fear of disclosing their identities or because of the inconvenience. Defendants counter with the suggestion that it is equally as plausible that the access code efforts failed primarily because most of the callers were minors.

**10.** *Cf. Rosen v. Port of Portland,* 641 F.2d 1243, 1251 (9th Cir.1981) (discussing the effect of a Portland ordinance requiring advance registration by those desiring to exercise first amendment rights in the airport terminal and the names and addresses of their sponsors):

Identification requirements impose heavy burdens on the exercise of first amendment rights. The right of those expressing political, religious, social or economic views to maintain their anonymity is historic, fundamental, and all too often necessary. The advocacy of unpopular causes may lead to reprisals—not only by government, but by employers, colleagues, or society in general. While many who express their views may be willing to accept these consequences, others not so brave or not so free to do so will be discour-

aged from engaging in public advocacy. The Port's interest underlying the identification requirement are insufficient to justify an ordinance so broad in its application and with so chilling an effect.

**11.** Sapphire's President Brendan Corrigan estimated that to implement an access code system, Sapphire would have to expend at least $200,000 for each of its ten message lines carrying explicit sexual messages. (Transcript, p. 13–14). This figure does not include the additional cost of hiring additional employees and effectuating new procedures for processing the assignment and cancellation of access codes. Mr. Corrigan also estimated that it would take at least 120 days to obtain equipment suitable for the entry of nine-digit access codes. (Transcript, p. 15). Although the First Amendment may not be used to shield plaintiffs from technological changes in the market or the economic consequences of reasonable regulation by state authorities, consideration of the cost of compliance is relevant in assessing the burden imposed by the statute on plaintiffs' protected speech rights.

**12.** The testimony of defendants' expert witness Mr. Louis Samsel, an engineer employed at the Public Utility Commission, corroborated plaintiffs' contention that approximately one-half all all telephone equipment in use is rotary dial. (*See* Transcript, p. 93). Mr. Samsel stated that customers with rotary phones could still access dial-a-porn providers with the purchase of a hand-held tone generator selling at an estimated cost of $19.95–$29.95. (Trancript, p. 94).

sections of the statute if the state had carried its burden of showing the absence of a less restrictive alternative. However, the record discloses that Bell of Pennsylvania has proposed a new telephone tariff which has already received approval from the Public Utilities Commission. This tariff, effective as of August 1, 1988, reassigns numbers held by providers of sexually explicit messages to a new telephone exchange with numbers starting with the 556 prefix. Pursuant to the tariff, the telephone company pre-blocks all telephone lines to numbers on this exchange. In order to access such numbers, customers of the phone company have to notify the telephone company in writing that they want that exchange unblocked.[13]

Prior to the new tariff, "voluntary" blocking was available only at the expense of screening out all other message services —ranging from weather reports and sports news to Santa Claus. The 556 exchange approved by the PUC, however, eliminates the all or nothing blocking alternative which constituted an impractical method of protecting minors because it placed unreasonable restrictions on protected speech.

The fact that a less restrictive procedure is already in place in Pennsylvania demonstrates that the access code requirement of the Telephone Message Services Act is not in fact the least restrictive means of protecting minors from dial-a-porn. On the contrary, said requirement serves only to raise greater barriers to adults' access to sexually explicit telephone messages.[14]

The Second Circuit's endorsement of access codes in *Carlin III* as a feasible means of furthering the state's interest in protecting minors from dial-a-porn is not at odds with the court's decision herein. *Carlin III* approved access codes not as a requirement of the law, but rather as a defense against prosecution. Moreover, the *Carlin III* ruling was clearly tailored to the technological constraints affecting the New York telephone exchange system. One such constraint, not present in the case at bar, was the telephone company's inability to centrally block dial-a-porn lines based on existing equipment and technology. Blocking was only feasible if performed on the customer premises at significant cost to said customer, and with the risk that such equipment would still be disabled by minors. Nonetheless, the Second Circuit viewed blocking important enough an alternative to remand to the Commission in *Carlin II* "for exploration of the alternative of shifting the cost of customer premises blocking equipment to service providers and/or telephone companies." *Carlin II*, 787 F.2d at 856. The advantage of blocking, according to the *Carlin II* court, is that it neither "involve[s] the purchase of ancillary tone devices for rotary dialing equipment, mailings, or written age identification and cancellation procedures", *Id.* nor "hinder[s] access by adults who wish to use these services or who would be deterred therefrom if required to place their name on someone's list." *Id.* at 857. Indeed, despite the Second Circuit's final approval of access codes in *Carlin III*, the court noted, "When ... any other less re-

---

**13.** The court is not called upon at this time to assess the constitutionality of the approved tariff. However, it clearly establishes an alternative less restrictive in character than the Pennsylvania statute at issue herein.

**14.** Undoubtedly, the Commonwealth would probably find the pre-blocking scheme without access codes inadequate to protect children who reside or are visitors in homes where the telephones are not blocked. This scenario, however, is no different from that where minors who are too young to buy porn magazines, still have access to the magazines purchased buy their older siblings or parents; the fact that children may have indirect access to such communications provides no adequate justification for placing greater burdens on adults' access to

protected speech. The childrearing responsibility of parents has long been a subject of Supreme Court commentary. *See e.g., Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (noting that "parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society"); *Bellotti v. Baird*, 443 U.S. 622, 637, 99 S.Ct. 3035, 3045, 61 L.Ed. 2d 797 (1979) (recognizing the "guiding role of parents in the upbringing of their children"). Hence, where state-imposed restrictions unreasonably burden the free speech rights of adults, parents must assume some responsibility for monitoring the messages accessed by their children.

**340**

strictive technology becomes available, we direct the FCC to reopen its proceedings to consider the costs and benefits of adding its use as an optional defense." 837 F.2d at 556.

Based on the above discussion, the court finds that the statute is constitutionally overbroad in that it regulates not only messages obscene as to minors but also messages merely sexually explicit or indecent as to adults. Consequently, it would have a tendency to chill protected speech and that as written it is not the least restrictive means of furthering the state's interest in shielding children from sexually explicit messages. Since the challenged provisions of the statute, § 2905(b), (c) and (d), are not readily subject to a narrowing construction, they shall be declared unconstitutional and their enforcement, permanently enjoined.

In view of this court's finding that the Commonwealth has not established its adoption of the least restrictive means of regulation, the court need not address plaintiffs' remaining challenges to the statute.

An appropriate order follows.

### ORDER

AND NOW, this 23rd day of August, 1988, IT IS ORDERED that:

1. Subsections b and c of § 2905 of Pennsylvania's Public Utility Code, 66 Pa. Cons.Stat. 101 *et seq.*, are declared unconstitutional to the extent that they impose obligations and duties on telephone message services providing messages containing explicit sexual material, and enforcement is permanently enjoined; and

2. Subsection d of said section is declared unconstitutional to the extent that it imposes enforcement duties on the telephone company which would violate the first amendment rights of providers of explicit sexual messages, and enforcement is permanently enjoined.