896 F.2d 780
 FABULOUS ASSOCIATES, INC.
v.
PENNSYLVANIA PUBLIC UTILITY COMMISSION, Robert Casey,
Governor of the Commonwealth of Pennsylvania, LeRoy S.
Zimmerman, Attorney General of the Commonwealth of
Pennsylvania, and Bell Telephone Co. of Pennsylvania.
SAPPHIRE COMMUNICATIONS OF PENNSYLVANIA, INC.
v.
Robert P. CASEY, LeRoy S. Zimmerman, and William Shane,
individually and in their official capacities.
Appeal of PENNSYLVANIA PUBLIC COMMISSION, Governor Robert P.
Casey, Attorney General LeRoy Zimmerman and
Chairman of the Public Utility
Commission, William Shane.
 No. 88-1689.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1989.
Decided Feb. 16, 1990.
 
 Ernest D. Preate, Jr., Atty. Gen., Thomas B. York (argued), Deputy Atty. Gen., Calvin R. Koons, John G. Knorr, III, Chief Deputy Attys. Gen., Chief, Litigation Section, Harrisburg, Pa., for appellants.
 David Rudovsky (argued), Kairys & Rudovsky, Philadelphia, Pa., for appellee, Fabulous Associates, Inc.
 Helen H. Richardson (argued), Phillips and Phelan, Philadelphia, Pa. (Lawrence E. Abelman, Norman S. Beier, Abelman, Frayne, Rezac & Schwab, New York City, of counsel), for appellee, Sapphire Communications of Pennsylvania, Inc.
 Mary E. Kohart, Paul R. Fitzmaurice, M. Lisabeth Shean (Drinker Biddle & Reath, of counsel), Philadelphia, Pa., for amicus curiae, American Civ. Liberties Union of Pennsylvania.
 Before SLOVITER, GREENBERG, and GARTH, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 A 1988 amendment to the Pennsylvania Public Utility Act requires, inter alia, that adults who wish to listen to sexually explicit recorded telephone messages apply for a nine-digit access code to receive such messages. The Act prohibits issuance of access codes to minors. Two companies that provide such recorded message services filed suit against the Pennsylvania Public Utility Commission, Robert Casey, Governor of the Commonwealth of Pennsylvania, and LeRoy S. Zimmerman, Pennsylvania's Attorney General, (jointly referred to as "Commonwealth")[1] for declaratory and injunctive relief to restrain the enforcement of the amendment. The district court held that the statute impermissibly burdened First Amendment rights and issued an injunction against its enforcement. The Commonwealth of Pennsylvania appealed. We notified the parties that the appeal would be held until the Supreme Court decided the then pending case of Sable Communications v. FCC, --- U.S. ----, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), because its decision on issues raised in that case might have some bearing on those before us here. After the Court's opinion in Sable was announced, the parties filed supplemental briefs, and we are thus prepared to consider the merits of the matter before us.
 
 I.
 Facts
 
 2
 Plaintiffs, Fabulous Associates and Sapphire Communications of Pennsylvania, provide recorded messages with sexually explicit messages to Pennsylvania consumers. Plaintiffs do so through recorded audiotex telephone services that use an outgoing tape-recorded message on a multi-line telephone answering machine which allows a large number of callers to hear the same message simultaneously.
 
 
 3
 The Pennsylvania legislature, apparently in an effort to prevent minors from gaining access to phone services that provide sexually explicit messages, sought to regulate the transmission of such messages over the phone lines by passage of an amendment which added a new section, section 2905, to the Pennsylvania Public Utility Act. 66 Pa.Cons.Stat.Ann. Sec. 2905 (Purdon Supp.1989). Section 2905 regulates notice, access codes, dissemination to minors, telephone company duties, costs of service, blocking access, and enforcement. The plaintiffs challenged subsections (b), the access code provision, (c), the provision prohibiting dissemination to minors, and (d), the provision imposing duties on the telephone company.[2]
 
 
 4
 Section 2905(a) requires that any provider of a charged message service must inform the caller that the cost will be charged to the customer's bill, that the charge will be itemized on the next bill, and, if applicable, that the message contains explicit sexual material. No charge can be made if the caller hangs up after the warning and before the message begins. This provision has not been challenged by plaintiffs, and its effect is undisturbed by the order of the district court.
 
 
 5
 Section 2905(b) provides that any person seeking to place a call to a telephone message service containing explicit sexual material must obtain an access code number or other identification number of not less than nine digits by submitting a written application to the telephone message service. The caller must present this number to the service after the warning message in order to complete the call. Section 2905(c) prohibits minors from obtaining access code numbers and requires the service to exercise all reasonable methods to ascertain that the applicant is not a minor.
 
 
 6
 Section 2905 must be read in conjunction with the Pennsylvania criminal law. Knowing distribution and utterance of obscene materials is prohibited. 18 Pa.Cons.Stat.Ann. Sec. 5903(a) (Purdon 1984). Under the criminal code, material is obscene if "the average person applying contemporary community standards would find that the subject matter taken as a whole appeals to the prurient interest," "the subject matter depicts or describes in a patently offensive way, the sexual conduct," and "the subject matter, taken as a whole, lacks serious literary, artistic, political, educational or scientific value." 18 Pa.Cons.Stat.Ann. 5903(b). This is essentially a recitation of the Supreme Court's obscenity standard. See Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). The Commonwealth does not contend that the material transmitted by either Fabulous or Sapphire is obscene as to adults.
 
 
 7
 Pennsylvania criminal law also flatly prohibits dissemination of "explicit sexual materials" to minors. 18 Pa.Cons.Stat.Ann. 5903(c). The term "explicit sexual materials" used in the Pennsylvania Public Utility Code is defined in the Pennsylvania criminal law to include obscene materials as well as:
 
 
 8
 (1) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or
 
 
 9
 (2) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1), or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.
 
 
 10
 18 Pa.Cons.Stat.Ann. Sec. 5903(c). The statute defines "harmful to minors" as a variation of the state's obscenity standard in terms of material suitable for minors.[3]
 
 
 11
 Before the 1988 amendment to the Pennsylvania Public Utility Act embodied in section 2905 went into effect, Fabulous and Sapphire brought separate suits seeking to have it declared unconstitutional as violative of their First Amendment rights and seeking to enjoin its implementation. The nub of their complaint was that section 2905 would impose costs and/or restrictions on their business which would effectively put them out of business and that the requirement that consumers obtain access codes would unduly limit adult access to sexually explicit speech that was not obscene.[4]
 
 
 12
 After a hearing in the suit brought by Fabulous and a denial of Fabulous' motion for a temporary restraining order, the two cases were consolidated and heard by the district court. At that time, the parties stipulated that the hearing on the preliminary injunction would be the final hearing. App. at 307. Thereafter, the district court declared that sections 2905(b), (c) and (d) were unconstitutionally overbroad to the extent they regulate messages merely sexually explicit or indecent as to adults and to the extent they impose obligations on providers of explicit sexual phone messages, or on the phone company, to enforce such measures. Fabulous Associates, Inc. v. Pennsylvania Pub. Util. Comm'n, 693 F.Supp. 332, 340 (E.D.Pa.1988).
 
 
 13
 On this appeal, we must decide the scope of our review, the level of scrutiny to apply to the state statute, and, finally, whether the record adduced before the district court supports its conclusion that the statute violates the First Amendment.
 
 II.
 Discussion
 A.
 Scope of Review
 
 14
 The Commonwealth does not argue that the speech at issue here is obscene. See Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (obscenity not protected by the First Amendment). It denominates the speech as indecent. We, therefore, begin with the proposition enunciated in Sable, where the Supreme Court, considering similar explicit sexual telephone messages, stated that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." Sable, 109 S.Ct. at 2836. Although the Commonwealth argues that it is permissible to apply a variable definition of obscenity to protect children from material harmful to them,[5] it concedes that section 2905 must be tested under First Amendment analysis.
 
 
 15
 We note that in the area of constitutional fact, we are not required to defer to factual inferences reached by the district court. See Bender v. Williamsport Area School Dist., 741 F.2d 538, 542 n. 3 (3d Cir.1984), vacated on other grounds, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). The Constitution requires that judges exercise independent appellate review "in order to preserve the precious liberties established and ordained by the Constitution." Bose Corp. v. Consumers Union, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). In this case, the parties agree that our scope of review of the district court's findings of fact is under the clearly erroneous test.
 
 B.
 Level of Scrutiny
 
 16
 The parties vigorously dispute the proper standard of scrutiny to be applied in this case. The district court found that section 2905 was a content-based regulation of speech and, using an exacting standard, found that it could only be upheld if the state demonstrated the existence of a compelling state interest and that the regulation constituted the least restrictive means of achieving the stated goals. 693 F.Supp. at 338. The Commonwealth argues that the district court erred in applying this level of scrutiny. It analogizes this case to FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), where the Supreme Court allowed regulation of indecent material under a less searching standard than the one adopted here by the district court.
 
 
 17
 In Pacifica, the Federal Communications Commission issued an order that a radio program that contained a monologue repeatedly and deliberately using words referring to excretory or sexual activities and organs that was broadcast in the afternoon when children were in the audience was indecent within the statute forbidding the use of "any obscene, indecent, or profane language by means of radio communication." 438 U.S. at 731, 98 S.Ct. at 3031 (quoting 18 U.S.C. Sec. 1464 (1976 ed.)). The Court rejected Pacifica's argument that the FCC's order was unconstitutional because the First Amendment protected broadcasts that are not obscene. The Court noted that "of all forms of communication, it is broadcasting that has received the most limited First Amendment protection." Id. at 748, 98 S.Ct. at 3040. The Court emphasized the special problems in broadcasting: prior warnings cannot protect the listener because the audience is continually tuning in and out, the material reaches into the privacy of a listener's home, and it is uniquely accessible for children. Id. at 748-49, 98 S.Ct. at 3039-40. These considerations justified special treatment of indecent broadcasting. The Court concluded that it was not unconstitutional for the Commission to have exercised its regulatory power using a nuisance rationale "under which context is all-important." Id. at 750, 98 S.Ct. at 3041. In the course of the opinion, the Pacifica Court expressly emphasized "the narrowness of [its] holding." Id. at 750, 98 S.Ct. at 3041.
 
 
 18
 The Commonwealth argues that the Pacifica standard, and not the more rigorous strict scrutiny standard, is applicable here because in the telephone situation, as with radio broadcasts, it is difficult to segregate children and adults. It argues that because of the compelling interest which the state has in the development of its youth, the rights of individuals must be balanced against the welfare of the community. The essence of the Commonwealth's argument on the level of scrutiny is that it would have us eschew any consideration of whether the Commonwealth has shown that the regulation is the least restrictive available.
 
 
 19
 However, just last term in Sable Communications v. FCC, --- U.S. ----, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court rejected the argument that strict scrutiny analysis is not required in dealing with the indecent telephone messages communicated via dial-a-porn services. In that case, the Court addressed the constitutionality of a 1988 amendment to the Communications Act of 1934 that imposed a blanket prohibition against indecent, as well as obscene, interstate commercial telephone messages. The government sought to justify the ban by arguing that "nothing less could prevent children from gaining access to such messages." Id. 109 S.Ct. at 2837. The Court recognized the compelling interest in shielding minors from the influence of literature that is not obscene by adult standards, but emphasized that such compelling ends do not justify means that are not carefully tailored to achieve those ends. Id. at 2836. It reiterated the traditional First Amendment analysis under which the government, when it seeks to regulate the content of constitutionally protected speech even to further a compelling interest, must choose "the least restrictive means to further the articulated interest." Id.
 
 
 20
 In Sable, the government, as the Commonwealth here, relied on Pacifica as support for the application of a less exacting scrutiny than strict scrutiny. The Court declined to do so, holding Pacifica to be "readily distinguishable." Id. at 2837. It characterized Pacifica as "an emphatically narrow holding," id., and emphasized the " 'unique' attributes of broadcasting," which is " 'uniquely pervasive' " and " 'uniquely accessible to children, even those too young to read.' " Id. (quoting Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3039-40). It stated that private commercial telephone messages are "substantially different from the public radio broadcast at issue in Pacifica" because, inter alia, there is no captive audience problem and the phone message is not as intrusive as the broadcast. Id. Applying the exacting standard of review traditionally applied to regulations that impact on material protected by the First Amendment, the Court concluded that the ban on obscene commercial telephone messages was constitutional, but that the ban on indecent telephone messages did not survive constitutional scrutiny because it was not narrowly tailored to serve the compelling interest asserted.
 
 
 21
 Even before Sable, the Second Circuit in its Carlin trilogy applied the least restrictive alternative analysis in its consideration of the validity of FCC regulations seeking to limit access to dial-a-porn messages by children through limiting the time of such messages, Carlin Communications, Inc. v. FCC (Carlin I), 749 F.2d 113, 121 (2d Cir.1984), limiting messages to those with access codes or credit cards, Carlin Communications, Inc. v. FCC (Carlin II), 787 F.2d 846, 855 (2d Cir.1986), and finally through a scheme involving access codes, scrambling and credit card payment. Carlin Communications, Inc. v. FCC (Carlin III), 837 F.2d 546, 555 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). The Pennsylvania statute requires an analytic framework similar to that applied in Sable and the Carlin trilogy. We conclude that the district court applied the correct standard in determining the constitutionality of the Pennsylvania statute.
 
 C.
 Impact on Protected Speech
 
 22
 Of course, if the impact of a regulation on protected speech is comparable to the sound made by the proverbial tree falling in an unpopulated forest, there is no event to trigger First Amendment analysis. The Commonwealth argues that plaintiffs have not shown that section 2905 imposes any restraint or impact on protected speech. It emphasizes that here, unlike in Sable, there is no outright prohibition of indecent communication. However, the First Amendment protects against government "inhibition as well as prohibition." Lamont v. Postmaster General, 381 U.S. 301, 309, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring). An identification requirement exerts an inhibitory effect, Talley v. California, 362 U.S. 60, 64-65, 80 S.Ct. 536, 538-39, 4 L.Ed.2d 559 (1960), and such deterrence raises First Amendment issues comparable to those raised by direct state imposed burdens or restrictions.
 
 
 23
 The district court, after an evidentiary hearing, found that the imposition of access codes unconstitutionally burdened the exercise of some adults' First Amendment rights. The bases for the court's conclusion were threefold: first, access codes impose a self-identification process, which carries with it "the societal opprobrium associated with dial-a-porn messages and the probable undesirability of having one's name and address at the disposal of message providers and other third parties." Id. at 338. Second, the district court found that the requirement to use access codes would impose substantial additional capital and operating costs on the providers of the message services. Id. Third, the court found that section 2905 would impose costs on potential patrons of the message services because those who possessed a rotary dial telephone could not access the messages without purchasing a more expensive touch tone service or a hand-held tone generator in order to use their access code. Id. The Commonwealth challenges each of these conclusions.
 
 
 24
 The inhibitory effect of access codes on potential users is, admittedly, elusive to gauge in a society where peep-shows and "adult" bookstores flourish. The Commonwealth argues that members of the public are not reluctant to identify their interest in material of this type because they use credit cards for live dial-a-porn telephone services and subscribe to magazines containing similar content. However, the record amply supports the conclusion of chill drawn by the district court. Officers of both Sapphire and Fabulous testified that it is usually "impulse callers" who utilize these types of services, and that people will not call if they must apply for an access code. App. at 203, 240-41.
 
 
 25
 Sapphire's president, Brendan Corrigan, testified that in the Washington D.C. area, after Sapphire switched to an identification number system, its revenues dropped from the $13,000 to $14,000 per month it received to zero. App. at 201. In fact, Sapphire received only two requests for identification numbers in an entire year. Id.
 
 
 26
 Sapphire's president also referred to testimony given during the FCC's notice and comment period on behalf of another audiotex company, Omniphone, which related an experience similar to Sapphire's. The FCC report, which was placed in the record in the district court, contains Omniphone's statement that it had "experience with two programs which required the caller to lower in part the curtain of anonymity. Both programs failed.... Analysis revealed, according to Omniphone, that callers are not willing to identify themselves." 2 FCC Rcd. Vol. 9, at 2717; App. at 175. Omniphone reported that it believed one reason for this is that "callers are concerned about abuse of information by message providers, as distinct from carriers." Id.
 
 
 27
 The Commonwealth introduced no testimony or other evidence to rebut the showing made on behalf of plaintiffs. If there is any basis for the Commonwealth's speculation that the consumers who were deterred in Maryland were minors, and that adults who would use the dial-a-porn message services were and are not deterred by concern that they will be identifiable by their placement on a list in the hands of the message providers, then it was incumbent on the Commonwealth to put forward evidence to that effect. On the record before us, there is more than enough evidence to support the district court's finding that access codes will chill the exercise of some users' right to hear protected communications.
 
 
 28
 The district court's finding that access codes will increase the costs of the message services was based on testimony presented by both plaintiffs. Sapphire currently operates approximately fifteen different programs in Pennsylvania, with ten lines playing programs that are sexually suggestive, and it receives therefrom income of between $40,000 and $50,000 per month. Corrigan testified that in order to implement an access code system, Sapphire would have to buy new equipment at a cost of approximately $200,000 per program, or $2 million dollars for the ten lines, App. at 198, and stated that the lead time for such equipment was longer than 30 days. App. at 200. He testified that under an access code system he would have to hire a new staff to solicit orders for the access codes, handle calls from potential customers, and maintain the list of access codes. App. at 199.
 
 
 29
 Joe Favole, President of Fabulous, testified that currently Fabulous rents a space the size of a small bedroom closet for its computer, which answers phone lines on a simultaneous multiple message basis. App. at 236-37. He testified that Fabulous could not afford to meet the costs attached to using an access code, which would require it to acquire new equipment, rent office space, get a telephone and pay employees to answer the phone. App. at 238-39. When the access code requirement went into effect, Fabulous changed its business to produce tapes that are "non-sexually explicit" to avoid these costs. App. at 237.
 
 
 30
 In an effort to rebut plaintiffs' testimony of costs imposed by access codes, the Commonwealth presented an expert witness who was asked to comment on Corrigan's testimony that the cost for one program would be $200,000. The Commonwealth's witness testified merely, "[o]ffhand I would suspect that number is quite a bit too high. I would think it would be much less than that on a per program basis." App. at 278. Even if this testimony were probative and even if the cost figure used by Sapphire is "too high," it is not contested that in order for the providers of these telephone message services to adapt to the access code requirement, they will be obliged to expend substantial sums for different technology, to change their methods of operation, and to incur substantially higher ongoing costs which could threaten the continuation of their services.
 
 
 31
 Finally, the fact that the access code system imposes additional costs on potential customers who own rotary phones is undisputed. The Commonwealth's witness estimated that half of the phones in Pennsylvania are rotary phones. App. at 278. He testified that the cost of the additional equipment needed so that rotary phones can utilize the access code number ranged from $19.95 to $29.95. App. at 279. The Commonwealth argues that this additional cost is offset by the lower cost of rotary phones compared to touch tone phones. It is, however, likely that many subscribers are using rotary phones because they cannot afford the higher cost of touch tone phones. Although the price of the additional equipment may not appear burdensome to the Commonwealth, we must not forget that the First Amendment is not available "merely to those who can pay their own way." Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). We have no basis to assume that the higher cost will not act as a deterrent to some potential users, particularly those who might otherwise be inclined to call the message service either on impulse or too infrequently to justify purchase of additional equipment.
 
 
 32
 We thus conclude that there is sufficient evidence to support the district court's finding that the statutory requirement of access codes to hear sexually suggestive telephone messages imposes a burden on the exercise of the callers' First Amendment rights and chills the message services' protected speech. As we discussed above, the Commonwealth may justify imposition of such a burden only if it shows that the restriction serves a compelling interest and that there are no less restrictive alternatives.
 
 D.
 First Amendment Balancing
 
 33
 There is little question that the interest of the state in shielding its youth from exposure to indecent materials is a compelling state interest. See Sable, 109 S.Ct. at 2836 ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards."); Ginsberg v. New York, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968) (a state "has an independent interest in the well-being of its youth"); New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 3359-60, 73 L.Ed.2d 1113 (1982) ("[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling' " (quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)); FCC v. Pacifica Foundation, 438 U.S. 726, 749-50, 98 S.Ct. 3026, 3040-41, 57 L.Ed.2d 1073 (1978) (government's interest in children's well-being justified regulation of otherwise protected expression).
 
 
 34
 We focus, therefore, on the more difficult question whether the Commonwealth has borne its "heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression." Carlin III, 837 F.2d at 555 (quoting Carlin I, 749 F.2d at 121); see also Sable, 109 S.Ct. at 2836. The district court held that such a less restrictive alternative was available by a system under which calls to dial-a-porn services would be pre-blocked until the customer requests the telephone company in writing to unblock the exchange. The court noted that the Pennsylvania Public Utilities Commission has approved a tariff by which providers of sexually explicit messages are reassigned to telephone numbers on a 556 exchange, which the telephone company pre-blocks from a central office. This system, unlike earlier ones, enables the subscriber to retain the option of calling other charged messages, such as weather, sports, and Santa Claus, while pre-blocking the 556 exchange. 693 F.Supp. at 339. Because the district court found that this system of pre-blocking dial-a-porn services[6] established "an alternative less restrictive in character" than access codes, 693 F.Supp. at 339 n. 13, it concluded that section 2905 is unconstitutional. The Commonwealth argues that the pre-blocking is not less restrictive because potential users must still expend the effort to write and request unblocking, with a consequential loss of anonymity.
 
 
 35
 Plaintiffs respond that loss of anonymity to the telephone company is far less chilling than is loss of anonymity to the message service. It is uncertain if the telephone company even maintains a separate list of subscribers who requested unblocking, as distinguished from a notation in the individual subscriber's file. In any event, there is evidence that the telephone company will not disclose such information. The President of Fabulous testified that he has tried for years to get the telephone company's records of persons who made calls to sexually explicit recorded services, but has met with no success. App. at 252-53.
 
 
 36
 Even if there is some chill associated with pre-blocking, that method of restricting access to minors does not entail the additional cost to the user of acquiring a touch tone phone or a hand-held device compatible with access codes. Nor does pre-blocking necessitate the substantial expenditures for the purchase of new equipment and increased operating costs by the message services which are required for an access code system. It follows that some form of blocking system is less restrictive than the imposition of access codes.[7]
 
 
 37
 The Commonwealth argues that central blocking would not fulfill the state's compelling interest as effectively as the access number does because minors with phone lines could request unblocking or could gain access to unblocked phones. It also argues that a parent who chooses to unblock the home's phone to gain access to sexually explicit material for himself or herself thereby places dial-a-porn phone service within the reach of minors with access to that phone. In this respect, the decision a parent must make is comparable to whether to keep sexually explicit books on the shelf or subscribe to adult magazines. No constitutional principle is implicated. The responsibility for making such choices is where our society has traditionally placed it--on the shoulders of the parent. See Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 73-74, 103 S.Ct. 2875, 2883-84, 77 L.Ed.2d 469 (1983) (parental discretion controlling access to unsolicited contraceptive advertisements in the home is the preferred method of dealing with such material).
 
 
 38
 Even with parental control, the Commonwealth is undoubtedly correct that there will be some minors who will find access to unblocked phones if they are determined to do so. As the Supreme Court noted in Sable, "[i]t may well be that there is no fail-safe method of guaranteeing that never will a minor be able to access the dial-a-porn system." 109 S.Ct. at 2838. Nonetheless, the Court did not deem the desire to prevent "a few of the most enterprising and disobedient young people," id., from securing access to such messages to be adequate justification for a statutory provision that had "the invalid effect of limiting the content of adult telephone conversations to that which is suitable for children." Id. at 2839. We hold that because the means used, requirement of an access code, substantially burdens the First Amendment right of adults to access to protected materials and is not the least restrictive alternative to achieve the compelling end sought, the statute cannot survive the constitutional attack.
 
 III.
 Conclusion
 
 39
 Government attempts to restrict dial-a-porn messages have not fared well in the courts. After three successive attempts by the Federal Communications Commission to promulgate regulations that would have provided defenses to the statutory criminal offense of transmission of obscene or indecent prerecorded messages in interstate commerce to persons under eighteen years of age, the Second Circuit held that the inclusion of "indecent" commercial telephone communications in the prohibition was overbroad insofar as it applied to nonobscene speech. Carlin III, 837 F.2d at 560-61. Congress' amendment of the statute, which totally banned access to sexually explicit messages for adults as well as minors, was held unconstitutional in Sable.
 
 
 40
 The Pennsylvania statute, directed to intrastate calls, takes a different approach by imposing restrictions short of a total ban as its effort in the continuing attempt to preclude minors' access to material deemed obscene as to them. As we have held, this statute is overbroad. We do not express any opinion as to the validity of other potential legislation designed to achieve the same end. Sufficient unto the day is the principle asserted picturesquely by Justice Frankfurter more than three decades ago that reducing the adult population to reading only what was fit for a child was like "burn[ing] up the house to roast the pig," Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1308, 1 L.Ed.2d 412 (1957), a phrase reiterated last term in Sable, 109 S.Ct. at 2839.
 
 
 41
 For the reasons set forth above, we will affirm the judgment of the district court.
 
 
 
 [1]
 Bell Telephone Company of Pennsylvania was joined as a defendant by Fabulous Associates, Inc. It took no active part in the litigation because it stated that it had been improperly joined, that it was not a real party in interest, and that any order binding on the government would be binding on it. App. at 188-89. It notified this court of its position and has filed no brief here
 
 
 [2]
 The statute provides in pertinent part:
 (b) Intrastate services.--Before any call can be completed to any telephone message service containing explicit sexual material, the caller shall have first obtained an access code number or other personal identification number consisting of not less than nine digits from the telephone message service through written application to the telephone message service. This access code number or personal identification number must be presented to the telephone message service after the warning message and in order to complete the call.
 (c) Dissemination to minors.--Access codes or personal identification numbers obtained to complete calls containing explicit sexual material as defined in 18 Pa.C.S. Sec. 5903 (relating to obscene and other sexual materials) shall not be issued to a minor. Telephone message services shall exercise all reasonable methods to ascertain that the applicant is not a minor.
 (d) Telephone company duties.--Every local telephone company and competitive interexchange telephone service shall list all telephone message service calls on the customer telephone bill and shall designate the type or title of message obtained. In addition, the telephone company shall provide, upon request, at no cost to the consumer, the name and address of any telephone service provider. All telephone companies shall include in their telephone message service tariffs, whether provided through the 976 exchange or otherwise, or in any contract with such telephone message service sponsor, a clause requiring compliance with this section as a condition for continuation of the service.
 
 
 [66]
 Pa.Cons.Stat.Ann. Sec. 2905 (Purdon Supp.1989)
 
 
 [3]
 "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:
 (i) predominantly appeals to the prurient, shameful, or morbid interest of minors; and
 (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
 (iii) is utterly without redeeming social importance for minors.
 
 
 [18]
 Pa.Cons.Stat.Ann. Sec. 5903(e)(6)
 
 
 [4]
 The Commonwealth has not challenged plaintiffs' standing to raise a challenge on behalf of their prospective customers. See Virginia v. American Booksellers Ass'n., Inc., 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988)
 
 
 [5]
 See Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 1279, 20 L.Ed.2d 195 (1968)
 
 
 [6]
 Central blocking can be effected either through pre-blocking by the telephone company, with unblocking at the request of the subscriber or voluntary blocking initiated by the subscriber. Challenges to the pre-blocking tariff are currently being litigated before the PUC. We intimate no opinion on the constitutionality of either form of blocking, inasmuch as we consider merely the comparative restrictiveness of access codes and pre-blocking
 
 
 [7]
 When the court in Carlin III determined that a scheme involving access codes, scrambling, and credit card payments was a less restrictive feasible alternative than blocking, it did so after evaluating the cost and feasibility of a device for customer premises blocking equipment. See 837 F.2d at 556. However, the relevant telephone companies had advised the court that a central blocking system was not feasible at that time in New York. Carlin II, 787 F.2d at 851. Therefore, the Second Circuit had no occasion to consider the issues before us